## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

ROGER DURAND, LINDA DURAND, )
and PRISCILLA DURAND, )
)
Plaintiffs, ) Court File No.
) 15-CV-02102 (RHK-SER)
v. )
)
FAIRVIEW HEALTH SERVICES, )
)
Defendant. )

Videoconference Deposition of JUDY A. SHEPARD-KEGL, Ph.D., taken pursuant to notice before Cindy Packard, RDR, a Notary Public in and for the State of Maine, at the law offices of Norman, Hanson & DeTroy, Two Canal Plaza, Portland, Maine, on August 11, 2016, commencing at 10:16 a.m.

---

GAIGE & FELICCITTI, LLC
205 Woodford Street
Portland, Maine 04103
(207)854-5296
gaigereporting@gmail.com

## Page 2

APPEARANCES

FOR THE PLAINTIFFS,

HEATHER M. GILBERT, ESQ.
TERRA FRAZIER, ESQ.
Gilbert Law PLLC
Windsor Office Plaza
1935 West County Road B-2, Suite 402
Roseville, Minnesota 55113
Phone: 651.340.9642

FOR THE DEFENDANT,

MATTHEW S. FRANTZEN, ESQ.
Gislason & Hunter LLP
701 Xenia Avenue South, Suite 500
Minneapolis, Minnesota 55416
Phone: 763.225.6000

## Page 3

INDEX

Deponent: JUDY A. SHEPARD-KEGL, Ph.D.

Examination by Mr. Frantzen     4
Examination by Ms. Gilbert      286

E X H I B I T S

| Exhibit No. | Exhibit Description | Page |
|---|---|---|
| 1 | Case List | 20 |
| 2 | Shepard-Kegl CV | 33 |
| 3 | Shepard-Kegl Expert Report | 60 |
| 4 | Anna Witter-Merithew Expert Rebuttal Report | 263 |

## Page 4

STIPULATION

It is hereby agreed by and between the parties that signature is not waived.

- - - - -

JUDY A. SHEPARD-KEGL, having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY MR. FRANTZEN:

Q. Good morning. Could you please state your name for the record?

A. **Judy Shepard-Kegl, S-H-E-P-A-R-D - K-E-G-L.**

Q. Good morning, Dr. Shepard-Kegl. We had a chance to chat briefly before the start of the deposition. As you know, my name is Matt Frantzen, and I represent the defendant in this case, Fairview Health Services.

Do you understand that?

A. **I do.**

Q. And we're conducting this deposition today by videoconference. You're in Portland, Maine; is that right?

A. **I am.**

Q. Miss Gilbert and I are in Minneapolis. We're doing this by videoconference. Can you see and hear me okay?

```
 1              now I want you to tell me the story speaking
 2              in English.
 3                        So I'm getting an ASL sample, a writing
 4              sample and a speech sample with the same
 5              narrative to look at what her skills are in
 6              those areas.  And I'll come back to that
 7              later on.
 8                        Then I do a thing called -- it's -- the
 9              task is also called the topological,
10              T-O-P-O-L-O-G-I-C-A-L, relations task.  Right
11              here it's called "Verbs of Location" or
12              Bowerman Task, which is its more informal
13              label.  Bowerman, B-O-W-E-R-M-A-N.
14                        That's a set of pictures, and the
15              pictures are -- give you relations between
16              some object and some other entity.
17                        So, for example, the first example is a
18              cup on a table.  Second example is an apple
19              in a bowl.  And the reason I go through this
20              series is, there's a grammatical difference
21              between American Sign Language and English.
22              American Sign Language tends to always put
23              the ground first and the figure second.
24                        So I have a bottle that's on the table
25              in front of me.  The more stable, larger
```

```
 1              thing is the ground.  That's the table.  And
 2              the thing that gets placed is the figure.
 3                        Or if a person's walking down the
 4              street, the street is the ground, and the
 5              person walking down the street is the figure.
 6                        In American Sign Language grammar, the
 7              ground is expressed prior to the figure.  In
 8              English, it's exactly the opposite.  The
 9              figure is expressed before the ground.
10                        So you would say, The bottle is on the
11              table.  But a deaf signer would say the
12              equivalent of table, bottle on.  So you get
13              ground and then figure.  So these are to see
14              what word order she tends to use when she
15              produces signing relative to these pictures.
16                        Okay.  You want me to do results, too,
17              of her?  Because her results --
18    Q.        Why don't we do this.  Why don't we go to the
19              next one, "Background Conversation."  And
20              just tell me what that means, that paragraph,
21              that phrase, background conversation?
22    A.        That's what this whole rest of the test is
23              about.  So if you went to -- I'm just telling
24              you, in case I don't say enough here, but if
25              you go to III.1.b. in everything up to 59,
```

```
 1              you will see the discussion of what the
 2              background conversation is and what it's
 3              about.
 4                        So background conversation includes
 5              their responses to all my questions under the
 6              cultural profile, any digressions in
 7              conversation, my questions about what
 8              happened to them in the hospital.  It's the
 9              background conversation that goes on
10              throughout the entirety of the testing.
11                        And I will shift in that background
12              conversation between signing kind of ASL to
13              them.  I'll shift to a little bit more
14              English kind of signing.  And just -- I'm
15              looking to see, are there places where they
16              understand worse or they understand better in
17              those -- in that regard.
18    Q.        Thank you.  Page 60, Doctor, heading
19              III.3.b., says:  Cognitive Academic Language
20              Proficiency.  And you have an acronym, CALP?
21    A.        CALP.
22    Q.        C-A-L-P?
23    A.        Yes.
24    Q.        Can you just tell me what CALP is and what
25              that tells us about a person's language
```

```
 1              proficiency and comprehension?
 2    A.        Can I start with BICS and go to CALP?
 3              Because it puts it in perspective.
 4    Q.        Absolutely.
 5    A.        So when you talk about language proficiency,
 6              you can look at someone who looks like
 7              they're a fluent speaker of English or a
 8              fluent signer.  And they can actually not
 9              have CALP.
10                        So BICS is Basic Interpersonal
11              Communication Skills.  Can you go to a
12              restaurant, can you go to a bar, sit down
13              across the table from someone and schmooze?
14              Can you talk to someone about, you know, sort
15              of everyday shared things in life?  Things
16              that you know.
17                        And there are many deaf people, many
18              hearing people who sign, who have BICS, who
19              can kind of talk about the here and now, the
20              everyday, the average conversational kinds of
21              stuff.
22                        But they don't all have CALP.  BICS is
23              something you learn in interaction with
24              others, you learn in the language.
25                        Studies that have been done on
```

**Page 105**

1 immigrants, for example, who come to the
2 country, within two or three years, they're
3 showing BICS in English, but they're not yet
4 showing CALP.
5 　　　　It takes time for that CALP to develop,
6 and it doesn't just develop with your
7 interactions with other people. It
8 develops -- you learn it. It's part of the
9 academic experience of using a language to
10 access information, particularly new
11 information.
12 　　　　So when I'm looking at someone's skills,
13 I'm looking for fluency, yes. But I'm also
14 looking at whether they can take information
15 that's coming in and read between the lines.
16 Whether they can do -- sort of analyze,
17 synthesize, do the kinds of things with
18 language that you need to do to work with
19 language in a school environment or learning
20 environment, or an environment like a
21 hospital where you've got to learn about
22 medical situations. That requires the use of
23 CALP.
24 　　　　And what I found -- if you want results,
25 what I found with her is, yes, she has CALP.

**Page 106**

1 Q. Let me step back. Actually, under BICS, you
2 　　found that: Miss Durand has mastery of
3 　　BICS --
4 A. Yes.
5 Q. -- in ASL. In casual conversation, she is
6 　　fluent and comprehends easily. Correct?
7 A. Yes, she does.
8 Q. Then under CALP, you say: When language
9 　　becomes more academic in nature or involves
10 　　explanation of new unfamiliar information or
11 　　tasks, Miss Durand is also competent to
12 　　follow the communication and assess it using
13 　　critical thinking. Correct?
14 A. Correct.
15 Q. And when we use the phrase "critical
16 　　thinking," what does that mean to you? What
17 　　do you mean by the use of the phrase critical
18 　　thinking?
19 A. What's -- why are people saying this? What's
20 　　the meaning behind the meaning? You know,
21 　　thinking about what's being told to you
22 　　rather than just taking it at face value.
23 　　　　Now, I looked at --
24 Q. You --
25 A. Yes?

**Page 107**

1 Q. Go ahead.
2 A. I looked at her CALP in specific ways, but
3 　　one way was presenting a narrative called
4 　　"Mr. Koumal Flies like a Bird," signed by a
5 　　native signer.
6 　　　　And it's a story that's allegorical.
7 　　It's about these three -- four birds that are
8 　　born to two bird parents, three of them have
9 　　bent beaks. They're eagles, and one has a
10 　　straight beak. And the straight-beak bird,
11 　　they call the doctor, they bring him in.
12 　　They take him to a church. They take him to
13 　　an ear, nose and throat specialist to see
14 　　what's wrong and why his beak is straight.
15 　　　　They consider surgery. It's too
16 　　expensive. They consider sending him to a
17 　　special school where they work to get his
18 　　beak to behave like an eagle's beak, and have
19 　　him value the things eagles value, et cetera,
20 　　et cetera.
21 　　　　The story is an allegory based on a deaf
22 　　child who is born in a family with hearing
23 　　parents and is different, and how the parents
24 　　try to fix them or try to rectify -- to make
25 　　them quote, unquote, normal or more like

**Page 108**

1 　　hearing.
2 　　　　Some people -- like you might have read
3 　　"Gulliver's Travels." Right? Some people
4 　　read "Gulliver's Travels," and it's this cool
5 　　little story about this guy who in one
6 　　context is a giant, and in another context is
7 　　this little person. But the reality is when
8 　　Melville [sic] wrote "Gulliver's Travels," it
9 　　was a satire on sort of politics of the day.
10 　　Political satire.
11 　　　　Could the person get anything beyond the
12 　　story of "Gulliver's Travels" and realize
13 　　it's political satire or not? Could the
14 　　person watching this story about these birds
15 　　think about the parallels to deaf culture and
16 　　what's going on in the deaf culture?
17 　　　　That's what I was looking at with "Bird
18 　　of a Different Feather." If a person has
19 　　some CALP, they can bring the argumentation
20 　　that these stories are parallel and recognize
21 　　these connections. If they don't have CALP,
22 　　they tend to take it as just a basic story,
23 　　fairy tale.
24 Q. And you found that Miss Durand had CALP?
25 A. Correct. And in that regard, I would be in

ATTACHMENT 23

## Page 109

conflict with Anna Witter-Merithew, who seems on her reading of my report some -- and the depositions, somehow doesn't think she has CALP.

I think a woman who has done all the education that she's done and behaved the way she did with my stuff clearly has the ability to process language in an academic environment.

Q. And you state -- the last sentence there under that CALP paragraph that: She -- referring to Linda Durand -- is capable of expressing and comprehending complex information. She can use her language to engage in analysis, synthesis and evaluation.
Correct?

A. Correct.

Q. And then next -- the next paragraph under there: Summary of ASL language proficiency.
You note in about the last sentence or two: She is proficient -- Linda Durand is: Proficient in using a PSE variant of ASL through which she can access any necessary information regarding medical issues.

My first question is -- I know it's

## Page 110

defined in your report, but I want you to tell me -- what is PSE as opposed to ASL?

A. Okay. So PSE, the spell-out of PSE is a term called Pidgin Sign English. It's now typically called contact signing. But what it means is, some people will sign ASL with strong use of ASL grammar, facial expression, 3-D use of space, the full grammar of ASL.

There are other people who will pick their signs typically as conceptually accurate ASL signs, but they'll favor. Where ASL would allow a certain order, order that would be more like English, they'll favor that order, and sometimes even favor the English order of elements in the way that they sign.

Miss Durand -- and it fits with her growing up in very hearing environments and her experiences and her not -- you know, knowledge of English, Miss Durand tends to use signing that is -- leans much more towards the English range of the spectrum of word order and grammatical decisions than ASL, except in the context of signing with her husband.

## Page 111

And second, she's been using ASL a lot more since she moved into working in deaf services, working in group homes and things like that. So she's -- she's got good reception of ASL, excellent reception of ASL, but her signing tends to lean toward this Pidgin Sign English form.

Q. And because of her abilities, both in this Pidgin Sign English and the American Sign Language, your last sentence of that paragraph says: There are even more interpreters proficient in using this contact signing form. So with an interpreter provided, Miss Durand would have had full access to communication in the hospital context. Correct?

A. Correct.

Q. Now, does that mean to you that if Fairview had provided qualified interpreters for the benefit of Linda Durand in May, 2013, that she would have had the ability to understand any medical information being conveyed to her regarding her son?

MS. GILBERT: Objection. Form.
THE DEPONENT: Yeah, I mean, you're kind

## Page 112

of moving away from the heart of it. What she could do is, she could certainly work with a wider range of interpreters than someone who very strongly fell into just the use of ASL.

There are some people where you shift into this PSE mode, and they -- their understanding starts to tank because they're missing lots of grammar. She's somebody who can kind of rely on her English to get a wider range of signing input.

So interpreters who were transliterators, more coding English, and interpreters who were using ASL, that whole range of people would be accessible to her. I'm not saying she's going to understand every -- everything that's said to her first shot, first on, that's it.

A Pidgin, by definition, requires a person to kind of do this dance to figure out how to match up with that individual.

So when I have -- as an interpreter, when I have someone who is more in that Pidgin Sign English range, I'm figuring out how much ASL can I put in there, how much can

```
 1            He's not the club goer that Linda is, but he
 2       goes to deaf events.  Married to a deaf
 3       spouse.
 4            His, you know -- his occupation --
 5       interesting schooling.  He has a lot of
 6       schooling.  He actually went to Gallaudet.
 7       He got an MA in psychology and social work,
 8       but his actual working has been pretty
 9       typical deaf occupations.
10            He's worked in -- you know, hard labor
11       jobs.  He was a dorm supervisor at North
12       Dakota School for the Deaf, worked as a
13       loader for UPS.  So pretty typical deaf-type
14       jobs, even though he advanced pretty far in
15       his education.
16            He reports his hearing loss as severe,
17       although Priscilla says that her perception
18       is that he's lost -- he doesn't think it's
19       changed from when he was little.  Her
20       perception is that he's lost some hearing
21       over the years.  And he'd be somebody I would
22       recommend maybe testing again.
23            So his early --
24  Q.   Was he wearing hearing aids during your
25       evaluation?
```

```
 1  A.   He wears hearing aids.
 2  Q.   Is it your understanding that he wears them
 3       all day every day?
 4  A.   I didn't ask that, but he does tend to use
 5       them to supplement speech, and he uses his
 6       hearing a lot.  So I assume he wears them
 7       pretty regularly.
 8  Q.   Okay.  Go ahead.
 9  A.   So in terms of sort of early life choices,
10       really early life choices, hearing emphasis,
11       you know, more hearing culture oriented.  But
12       by middle school, he was put in a school for
13       the deaf so he got that early exposure.
14       Later life choices show an affinity with deaf
15       culture, in some ways more so than Linda
16       Durand.
17            He has a lot more knowledge.  When we
18       did the study -- when we did the looking at
19       CALP and ASL, and he watched the "Bird of a
20       Different Feather," he was much quicker to
21       pick up on the deaf-related jokes and things
22       that were inside of there than Linda was.
23       Linda got the parallels, but he was able to
24       get a more fine-grained sense of it.
25            So, you know, he -- again, he reports
```

```
 1       requesting interpreters regularly, important
 2       interchanges.  He doesn't use them all the
 3       time.  He's very aware of the signing
 4       limitations of his children and prefers not
 5       to have them try to sign for him.
 6            So I expect second-language learner
 7       proficiency in ASL for him, exposure from the
 8       age of 12 in residential schools for the
 9       deaf.  And for the most part, that's what I
10       see in terms of his ASL skills.  His ASL is
11       pretty good.
12            He tends to lean towards the English
13       type of ASL.  I would say that Linda Durand
14       understands some of the more ASL
15       grammar-ish-type things than -- a little
16       better than Roger does.  But he's got more of
17       the deaf culture exposure than she has.
18  Q.   If you could turn to page 80, Doctor, of your
19       report.
20  A.   Uh-huh.
21  Q.   Under "Background Conversation," we had
22       talked about that with Linda Durand.  But
23       under background conversation, based upon
24       your communication with Roger Durand, you
25       concluded that he:  Understood background
```

```
 1       conversation with ease, even when topics
 2       moved into new or complex information.
 3            Correct?
 4  A.   Yes.
 5  Q.   And my question for you is:  What new or
 6       complex information were you discussing with
 7       Mr. Durand?
 8  A.   I mean, I discussed everything from their
 9       medical situation to, you know, the stories
10       that we provided, to his work.  Everything we
11       talked about, he seemed to understand the
12       range of things that I was using.
13  Q.   Okay.  And if we go down, we talked about
14       BICS and CALP also with respect to Linda
15       Durand.  You did the same here.
16            You say on page 80, under the "BICS v.
17       CALP," that:  As might be expected since he
18       earned both a degree at Gallaudet and a
19       subsequent master's degree, Mr. Durand
20       demonstrates CALP in both English and ASL.
21            Correct?
22  A.   Yeah.
23  Q.   And "In background conversation and in his
24       analysis of 'Bird of a Different Feather,'"
25       you say he:  Demonstrated skills in
```

**ATTACHMENT 23**

## Page 189

```
 1              evaluation, analysis and synthesis.
 2              Correct?
 3     A.    Correct.
 4     Q.    And then down at the bottom, BICS, again, you
 5           concluded he: Has mastery of BICS in ASL.
 6              And that: In casual conversation, he is
 7           fluent and comprehends easily. Correct?
 8     A.    Correct.
 9     Q.    And that casual conversation and him being
10           fluent, is that signing or was that
11           lipreading or both?
12     A.    Signing.
13     Q.    Okay.
14     A.    The one place in his ASL proficiency where I
15           saw a dip, he understood the "Bird of a
16           Different Feather" fine, which is pretty
17           standard ASL.
18              I also presented both of them with a
19           classifier story by David Rivera that really,
20           really uses complex classifier verbs in
21           motion, location, grammar ASL. And he
22           struggled. That's kind of -- kind of ASL
23           that he uses. And he is on -- more on that
24           PSE range.
25              So he really -- he struggled with that.
```

## Page 190

```
 1           But I would say, you know, deaf people not
 2           familiar with that art form would struggle,
 3           too. His bilingualism, I think, brings him a
 4           little more toward the English in
 5           comprehension.
 6     Q.    And when you say "bilingual," which two
 7           languages are you referring to?
 8     A.    ASL and English.
 9     Q.    Okay. Up on top of page 81, under the CALP
10           heading there, Roman numeral III.3.b., you
11           say: When language becomes more academic in
12           nature or involves explanation of new
13           unfamiliar information or tasks, Mr. Durand
14           also shows proficiency. Correct?
15     A.    That's correct. I mean, he's got -- he's
16           bilingual in English and ASL. The critical
17           thing is not that he's bilingual -- it's
18           not -- he's a smart guy. He's got cognitive
19           academic skills. He can understand stuff
20           presented at a high level in ASL. He's not
21           stupid. He just can't hear. The issue is,
22           he's cut off from information by not being
23           able to hear it effectively.
24     Q.    Sure.
25     A.    Okay.
```

## Page 191

```
 1     Q.    Then if you go down still on page 81, you
 2           also assessed his speech quality. You found
 3           it to be highly intelligible and easy to
 4           understand. Is that right?
 5     A.    Yes.
 6     Q.    And then you did that auditory monitoring
 7           alone. And that with auditor monitoring
 8           alone, his speech was: Intelligible even to
 9           someone unfamiliar with deaf speech.
10              Is that right?
11     A.    Yes. I think you would understand him fine.
12     Q.    Is his speech, in your estimation, more
13           understandable than that of his wife, Linda?
14     A.    Yes.
15     Q.    Okay. And then you go down to lipreading.
16           Again, now we're on the bottom of page 81.
17           And you conclude that he, like his wife, is
18           an excellent lipreader; correct?
19     A.    Correct. But unlike his wife, I think he
20           relies on that auditory -- sort of the
21           residual auditory input for lipreading. So
22           when you turn off the sound, he's worse than
23           she is.
24     Q.    Is it your understanding that Roger's hearing
25           is at a higher level or is better than that
```

## Page 192

```
 1           of his wife, Linda?
 2              MS. GILBERT: Objection. Form.
 3              THE DEPONENT: I don't know.
 4     BY MR. FRANTZEN:
 5     Q.    Is his decibel loss less severe, to your
 6           knowledge, than Linda's?
 7     A.    By their reports, it should be. By their
 8           reports, she says she was severe as a child,
 9           became profound.
10              He says he was severe as a child -- very
11           severe as a child and not -- didn't change.
12           But Priscilla's perception is that he has,
13           that he's moving more into the profound
14           range.
15              But I would say from his
16           self-perspective, he perceives himself as
17           hearing more than she does. But by his
18           performance on the soundless lipreading
19           tests, I think he uses external sound more
20           than she does. So he's at more of a
21           disadvantage in -- with background noise.
22     Q.    Okay. If we jump ahead to page 97 of your
23           report, Doctor, you note that, again, under
24           ideal conditions, his ability -- or: His
25           ability to lipread in ideal conditions is
```

Page 201:

```
 1            interpreter under all those circumstances you
 2            outlined?
 3   A.   No, I didn't say that. I said he could
 4        lipread effectively.
 5            MS. GILBERT: Objection. Form.
 6            THE DEPONENT: I said he could lipread
 7        effectively. I didn't say he could
 8        understand. A person who can hear --
 9   BY MR. FRANTZEN:
10   Q.   What does "communication access" mean to you?
11   A.   A person who can hear cannot always
12        understand. So I'm just --
13   Q.   He can ask questions?
14   A.   He could ask questions. He could ask for
15        clarification. The doctor could probe for
16        understanding, all of those things would need
17        to still happen. The fact that he could
18        lipread does not mean he could understand.
19   Q.   But what does communication access mean? I'm
20        using your words.
21   A.   Communication access means he had access to
22        this. And with the proper supports and stuff
23        that could have happened, he could have
24        gotten by. Yes.
25   Q.   Without an interpreter?
```

Page 202:

```
 1   A.   But don't --
 2   Q.   Thank you.
 3   A.   But don't rephrase my words into he could
 4        have understood. Okay. Because --
 5   Q.   I'll take what you've told me --
 6   A.   -- just sitting there and lipreading him --
 7        like if he sat here and just watched the
 8        person who was doing something and lipread,
 9        I'm not saying that he would have understood
10        everything. There's a dynamic that would
11        have had to happen.
12   Q.   Why don't we take five minutes, go off the
13        record.
14   A.   Can I add one thing? I think it's important,
15        and it did come up here. There are certain
16        things that need to be unpacked for both of
17        them. You know, one of them -- I think a
18        telling thing is that example with comfort
19        care. Lipreading it would not guarantee that
20        Roger would understand the nuance behind all
21        of that stuff. Right.
22            So that -- that kind of exposure to
23        English is a piece that he didn't have. And
24        an interpreter would have known to unpack
25        that, to take the implicit and make it
```

Page 203:

```
 1        explicit. A doctor might have or might not
 2        have known to unpack it.
 3            Roger might have or might not have known
 4        to express that he didn't understand or ask a
 5        question because if he thought it -- if he
 6        thought he understood what was going on,
 7        like, We're going to move him out of ICU up
 8        to the fourth floor. Now we're going to
 9        focus on comfort care.
10            If he believed that that meant that
11        he's -- it's no longer so intense that we
12        have to be right here in ICU, he's a little
13        bit more stable. So now we're going to get
14        up there and just focus on comfort care, as
15        opposed to, We can't do anything more for him
16        and he's dying. We're going to put him
17        upstairs. He's going to die, but we're going
18        to put him on comfort care.
19            If Roger thought, which I believe he
20        did, if he thought he understood that
21        information, and Linda did as well, it would
22        not -- talking to a doctor one-on-one would
23        not have disabused him of that unless the
24        doctor probed for his understanding.
25            An interpreter would have -- should have
```

Page 204:

```
 1        probed for understanding there. And would --
 2        I think, would have. A good interpreter
 3        would have.
 4   Q.   But you don't have any criticisms of the
 5        interpreters provided in this case; correct?
 6   A.   When Anna --
 7   Q.   There's nothing in your report?
 8   A.   When Anna Witter-Merithew says that these
 9        guys with an interpreter wouldn't have
10        understood implicit information, that makes
11        me question either Anna or the interpreters.
12        One or the other has to have a problem.
13            Because these guys have CALP. They have
14        the ability to take implicit from explicit.
15        But if they don't -- if they don't know what
16        they don't know, if they don't understand
17        that they've under -- misunderstood
18        something, if no one's probed for that
19        understanding, yeah, they could have gone on
20        and misunderstood.
21            But an interpreter in that situation --
22        let me put it this way: An interpreter who
23        knew the context would have unpacked that and
24        would have checked for understanding. An
25        interpreter who is only in there for a little
```