| | |
|---|---|
| Roger Durand, Linda Durand, and Priscilla Durand, | Court File No. 15-CV-02102 (RHK-SER) |
| Plaintiffs, | **DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| v | |
| Fairview Health Services, | |
| Defendant. | |

## INTRODUCTION

Plaintiffs Roger, Linda, and Priscilla Durand claim Defendant Fairview Health Services ("Fairview") discriminated against them during Shaun Durand's final hospitalization at Fairview Ridges Hospital.  Roger and Linda Durand claim Fairview violated Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq.* ("ADA"), Section 504 of the Federal Rehabilitation Act, 29 U.S.C. § 794 *et. seq.* ("RA"), and Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et. seq.* ("MHRA").  Priscilla Durand claims Fairview violated Title III of the ADA and Section 504 of the RA.

For the reasons set forth below, the Court should grant Fairview's motion for summary judgment as a matter of law pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## STATEMENT OF RELEVANT FACTS

This matter arises out of the May 7, 2013 to May 9, 2013 hospitalization of Shaun Durand, the 31-year-old son of Roger and Linda Durand and the brother of Priscilla

1

Durand, at Fairview Ridges Hospital.  (Ex 1 at ¶¶ 1, 12, 13, 14, 16.)  Roger and Linda Durand are deaf and Priscilla Durand is their hearing 32-year-old daughter.  (*Id*. at ¶¶ 1, 14, 16.)  Plaintiffs claim that Fairview discriminated against them when it allegedly "failed to provide" sign language interpreters "and other forms of auxiliary aids to ensure equal and effective communication between Plaintiffs … and Ridges Hospital staff, and denied Plaintiffs full and equal services and benefits[.]"  (*Id*. at ¶ 1, 46-48, 53-55, 61-63.)  Plaintiffs allege that while at Ridges Hospital, they "made several requests … for a qualified sign language interpreter" but that Fairview "did not provide a qualified sign language interpreter for many important communications between" Roger and Linda Durand and Fairview's staff "concerning diagnosis, medical care and/or treatment for Shaun Durand."  (*Id*. at ¶¶ 21-22.)  As such, Plaintiffs claim Fairview violated State and Federal law.  (*Id*. at ¶ 1.)

### Plaintiffs' Communication Abilities

Linda Durand communicates with Priscilla Durand and the rest of her children through a combination of talking (speaking audibly) and sign language and she homeschooled all of her children and taught the curriculum in this manner.  (Ex 2 at 16-17, 23-27, 32; Ex 3 at 42.)  Roger Durand communicates with Priscilla Durand (and his other children) by sign language and by "try[ing] to hear what she is saying," he can hear and understand her voice and read her lips "and see the signs that she's signing and they compl[e]ment each other."  (Ex 3 at 42; Ex 4 at 28-29; Ex 5 at 12, 14.)  When communicating with Linda Durand, he uses "total communication" or "anything that

works" and that "total communication" includes speaking, lip reading, signing, "gestures, expressions, anything. Environmental cues, anything." (Ex 4 at 27-28, 31.)

### Shaun Durand's Health History and Medical Decision-Making

Long before Shaun Durand was admitted to Ridges Hospital in May 2013, he and Priscilla Durand had already made the key decisions regarding end-of-life care.

Prior to May 2013, Shaun Durand had undergone heart surgeries and had been diagnosed with "end-stage heart disease," "multiorgan failure," and "chronic renal impairment." (Exs 6-7.) His physicians had determined by April 2013 that "there is not much more for us to offer." (Ex 7 at 632.)

On October 26, 2012, Shaun Durand completed an Authorization to Discuss Protected Health Information, in which he designated four people with whom his medical information could be shared: Priscilla, Pauline, Darlene, and D.J. Durand. (Ex 8.) In a February 11, 2013 Health Care Directive, he designated Priscilla Durand, a full-time certified medical assistant employed at Fairview Ridges Clinic, to be his sole health care agent. (Ex 9; Ex 3 at 9-17; Ex 1 at ¶ 15.) Neither Roger nor Linda Durand were designated to receive medical information regarding Shaun Durand or to make health care decisions for him, nor were they involved in any such decision-making in the months and years before his death. (Ex 8; Ex 9; Ex 2 at 52-54, 57-58; Ex 4 at p. 38-40, 46-47 – stating "[t]here was no relationship" between him and his son, that he "rarely saw him," that he had "[n]ot really" been involved in or been apprised of his son's medical condition in the two years before his death, and that when he attended a hospice meeting in December 2012 he "didn't participate" and was "just observing.") Indeed, Roger

Durand testified that while at Ridges Hospital during the hospitalization at issue, he and his wife "were not part of the planning, making decisions[,]" stating that "I'm pretty sure Shaun didn't really want us to be involved with that, so we stood back. We were there just to support the family." (Ex 4 at 90.)

Priscilla Durand was designated "to represent" Shaun Durand's "wishes and make [his] health care decisions[.]" (Ex 9 at 1.) Shaun Durand chose not to have "CPR attempted," which was consistent with a Provider Orders for Life Sustaining Treatment (POLST) he and Priscilla Durand executed in December 2012. (*Id*. at 3; Ex 7 at 633; Ex 10.) He also made several express "wishes," including, "I would not want Roger, Linda, or Pauline Durand present (mom, dad, [and] sister)" when "nearing my death." (Ex 9 at 5.)

On April 11, 2013, Shaun and Priscilla Durand participated in a palliative care conference with Amy Klopp, an advanced practice nurse and clinical nurse specialist employed by Fairview. (Ex 7 at 633-640; Ex 11 at 8-11.) In her note, Nurse Klopp stated that Shaun Durand "prefers any conversation for decision making be with his sister and HCA Priscilla." (Ex 7 at 634.) Nurse Klopp also noted that she discussed with Priscilla Durand the "appropriateness of hospice if [patient] does not improve or continues to decline[.]" (*Id*. at 635.) Roger and Linda Durand were present for that care conference and an interpreter was provided. (*Id*. at 890-91; Ex 2 at 41-42; Ex 3 at 129; Ex 4 at 44-45.) Nurse Klopp testified that Shaun Durand had a "very end of life diagnosis" and that he and Priscilla Durand "clearly understood that he had a very life threatening illness and could die very soon." (Ex 11 at 167-68, 171).

As of April 2013, Priscilla Durand understood that her brother had multi-organ failure and that he did not want to undergo a heart transplant, and she communicated this information to her parents without the assistance of an interpreter. (Ex 3 at 121-22; Ex 2 at 43-44, 49-51; Ex 4 at 48-54.) She understood that her brother's lifespan was limited and testified that her parents also had that understanding. (Ex 3 at 122; Ex 4 at 53 – stating that in April 2013 "we knew that [Shaun] didn't have much time left.")

### May 7

Priscilla Durand brought Shaun Durand to Ridges Hospital on May 7 because his health was "rapidly deteriorating from complications" of Marfan syndrome, a "terminal degenerative disorder," and he was ultimately admitted into the intensive care unit in "guarded" condition. (Ex 1 at ¶ 19; Ex 3 at 130; Ex 12 at 771-78; 790.) Roger and Linda Durand were not present at the hospital on May 7, Priscilla Durand did not "call people and tell them what was going on at that point," and she did not have any discussions regarding interpreters that day. (Ex 3 at 131.)

### May 8

Darlene Durand said her sister, Priscilla Durand, called her on the morning of May 8 and "had made [her] aware of what was going on with Shaun and that [she] needed to go to the hospital because they were going to be giving him some medicine and most likely he wasn't going to wake up after the medicine was given to him[.]" (Ex 5 at 37.) Priscilla Durand told her that "'[t]his is it so you need to get up here right away,' because after they gave him this medicine, then he's probably not going to wake up." (*Id.*) Darlene Durand then went to her parents' house to tell them "to get up to the hospital" –

she told them "'[d]on't go to work. You guys need to come up to the hospital right away'" and that "'[y]ou guys need to go up to the hospital right now. This is probably going to be it.'" (Ex 5 at 37-38.) Linda Durand also received an email from Priscilla Durand between 12:00 p.m. and 12:30 p.m. on May 8 regarding Shaun Durand's admission and Linda and Roger Durand arrived at Ridges Hospital at approximately 1:30 p.m. (Ex 2 at 58-59; Ex 3 at 132-33; Ex 4 at 63-64.)

Nurse Klopp convened two separate care conferences on May 8. (Ex 12 at 779-85.) The first conference was with Priscilla Durand and the second was with Roger and Linda Durand, an interpreter, and other family members. (*Id.* at 779; Ex 3 at 132, 138-44; Ex 11 at 116, 123-24, 129-30, 176.)

The purpose of the first conference with Priscilla Durand was to "meet with people who are in charge of making the decisions." (Ex 11 at 129, 175-76, 196, 203-04.) Priscilla Durand testified that because of Shaun Durand's prognosis, she made the decision for him to be placed on comfort care. (Ex 3 at 135-36.) Nurse Klopp testified that she was "unable to speak with Shaun at first and spoke with Priscilla and her brother reviewing understanding of current status, reviewing patient's goals of care, what was important to him, and then developing a plan based on those two things." (Ex 11 at 171.) In her note from the initial conference, Nurse Klopp stated that "[t]hey do not think [Shaun] would want to again pursue medical care at the U of M and decisions were made to focus on comfort cares[.]" (Ex 12 at 779.) After the first conference, Nurse Klopp and Priscilla Durand "planned to meet with the whole family" and Nurse Klopp knew that

Priscilla's parents were deaf and needed an interpreter. (Ex 11 at 45-46, 118, 123, 194-95; Ex 3 at 132-33.)

> The purpose of the second conference was:
>
> To acknowledge that when a patient is seriously ill, they are not the only people affected by the illness. We like to bring together all of the stakeholders in a patient's life and give them the courtesy of explaining what decisions are made and why so that as the survivors of all of this, they can leave in a place that is somewhat settled with some understanding.

(Ex 11 at 153, 175-76.) The second conference was designed "to pull everyone in that holds a stake and give them an opportunity to ask questions and understand what is going on," but that while Nurse Klopp would "absolutely take a request into account from a patient's loved ones … any action would need an okay from the patient or the health care agent" because the patient or their health care agent make the final decisions regarding health care. (*Id.* at 129-30, 169.)

Roger Durand testified that when he arrived at the hospital, he found his family and they "explained," without an interpreter, what was going on with Shaun Durand and "got us up to speed on what they knew so far." (Ex 4 at 64-65.) Linda Durand testified that once she arrived at the hospital she went to the nurse's station and requested an interpreter because she "wanted to know exactly what was going on[.]" (Ex 2 at 62.) An interpreter from a third-party vendor was dispatched at 2:52 p.m., arrived at Ridges Hospital at 3:44 p.m., and participated in a care conference with Nurse Klopp. (Ex 13; Ex 2 at 69-70.)

Nurse Klopp testified that during the second conference she would have provided information to the family – including Roger and Linda Durand through an interpreter –

about the care decisions that had been made earlier by Priscilla Durand, including the decision to elect comfort care, and Shaun Durand's diagnosis and prognosis. (Ex 11 at 180-81, 183-84; Ex 12 at 779.) According to Priscilla Durand, the second conference "ended up being way shorter," they "didn't talk about nearly the amount of things that we had talked about earlier that morning," there was less "level of detail," and she felt like it was "more to skim over and just give like a cliff notes version of what was happening." (Ex 3 at 140, 146.) Despite this, she did not ask Nurse Klopp to repeat everything from the earlier conference and acknowledged that Nurse Klopp did not refuse to repeat information from the initial conference. (*Id*. at 142-44.) Indeed, she admitted that, among other information, Nurse Klopp advised the family that Shaun Durand would be on comfort care but did not "go over what comfort care was." (*Id*. at 146.) She also testified that Nurse Klopp never said the words "Shaun is dying[.]" (*Id.* at 147.)

Roger Durand testified that Nurse Klopp – through an interpreter – "talked a little bit about what they were doing with Shaun" and talked about "comfort care[.]" (Ex 4 at 67-68.) He understood they were "keeping [Shaun] comfortable with … medicine and … pain reduction," and he was given "a general idea about what they were doing with [Shaun], … why [Shaun] was there and what they were doing as far as comfort care, but [he] didn't know what that meant yet." (*Id.*) Linda Durand claims that although an interpreter was present during the second conference, she did not understand the terminology being used, "what [Nurse Klopp] was trying to tell us or what was being discussed before she came and talked to us[.]" (Ex 2 at 70.) But Linda Durand acknowledged that she had an opportunity to ask questions to clarify her understanding

and that she did ask questions; however, she alleges that "if I had more information, I would have asked more questions, but I didn't know anything coming into that meeting." (*Id.*) Linda Durand also testified that Roger Durand had "the opportunity" to ask questions of Nurse Klopp through an interpreter but she did not "think he asked." (*Id*. at 94-95.)

In addition to the conference with Nurse Klopp, Linda Durand testified that there was a meeting with a physician, Dr. Faiqa Malik, at approximately 5:00 p.m. (*Id*. at 74-76.) An interpreter was present and Linda Durand recalls discussing "comforting" Shaun Durand and that "comfort was the No. 1 key issue[.]" (*Id*. at 74-76, 85-87.) Linda Durand acknowledges that she "had the opportunity to ask questions" of Dr. Malik through an interpreter at that meeting, but does not recall if she did. (*Id*. at 87-88.) In addition, Linda Durand testified that Roger Durand had "the opportunity" to ask questions with the assistance of the interpreter but she did not believe he asked any. (*Id*. at 94-95.)

Roger Durand did not ask any questions during the meetings with Nurse Klopp or Dr. Malik because he did not feel there was time and he did not want to keep them. (Ex 5 at 70-71.) He also stated:

> I didn't really feel like I had the right to [ask questions] at that time because of my relationship with [Shaun] – because my relationship with him, not the doctors, I just kind of kept back and observed and I was there for support.

> I never talked to any of the doctors or nurses … I was out of the picture … I was standing in the background as they -- I wasn't involved, like I said, in any decision making. I didn't feel like it was my place because Shaun didn't want me around in the past.

> Things were getting better, but things don't change overnight, as you know,
> so I pretty much stayed out of that because sometimes I felt Linda and I
> were more of bother (sic) than a help by being involved.

(*Id*. at 71, 118-19.)

The interpreter left Ridges Hospital at 6:00 p.m., two hours and sixteen minutes after she arrived. (Exs 13-14.) Roger Durand testified that he never told the interpreter he wanted her to stay after the meetings ended, never told her he would need her for interpreting later that evening, and never advised anyone that he needed an interpreter after the meeting. (Ex 4 at 79-81.) Indeed, he admitted that he "never asked for an interpreter ever for the whole time" while at Ridges Hospital. (*Id*. at 76-77, 87-88.) Instead, he let Priscilla Durand "explain to us … what she felt free to share with us at that time and I figured she would let us know what the important things were[.]" (*Id*. at 73.) Linda Durand testified that she did not ask for another interpreter on May 8 or advise anyone at Fairview that she wanted an interpreter present in Shaun Durand's room once the interpreter left the hospital. (Ex 2 at 89 – also testifying that she never advised Fairview that she wanted an interpreter for two- to three-hour blocks of time.)

Roger and Linda Durand stayed at the hospital overnight and "didn't bother" Priscilla Durand because they "generally knew what was happening, so we didn't want to put pressure on" Priscilla by asking her questions about their son's medical condition and decision making. (Ex 4 at 82-83.)

**May 9**

Nurse Klopp convened another conference during the early afternoon of May 9 and an interpreter was present for Roger and Linda Durand. (Ex 2 at 100-02; Ex 11 at

184-85, 187-88; Ex 12 at 797-99.) Nurse Klopp's note for the conference states that "[a]fter discussions yesterday, focus of care has been shifted to comfort only, support [patient] symptomatically during dying process." (Ex 12 at 797.) Her note also states that Shaun Durand's prognosis was "[p]oor, dying," that the "goals of care" were "[c]omfort [c]are, no further interventions or monitoring not intended for comfort," and that she had "[s]pent much time with family for support and discussion about dying process and ways of managing symptoms. Interpreter present for parents." (*Id*. at 798.)

Linda Durand acknowledged that an interpreter was present during this entire conference and documents produced by the interpreter agency establish that an interpreter was available to Plaintiffs from 12:00 p.m. to 1:00 p.m. (Ex 2 at 101; Ex 15.) Linda Durand testified that Nurse Klopp "mentioned about sending Shaun home and that my family – I remember Pauline mentioning that she felt like he should stay to make him more comfortable." (Ex 2 at 101.) Linda Durand understood that the decision was made by her children to keep Shaun Durand in the hospital because "[t]hey didn't feel it was the right time to move him to home yet" and they did not believe they could care for him. (*Id*. at 102-05; *see also* Ex 12 at 770.) She also understood that her son was going to be moved from the ICU to the fifth floor and that "he wasn't going to receive more care[.]" (Ex 2 at 106-07.)

Nurse Klopp testified that no one ever told her that Roger and Linda Durand wanted an interpreter for any other time outside of the May 8 and May 9 conferences; however, she would have "looked into the ways of making that happen" had such a request been made. (Ex 11 at 177, 188, 194-95.) Further, no one ever told her that Roger

or Linda Durand wanted or required an interpreter to be in their son's room at all times, or that they wanted or required an interpreter on an around-the-clock, 24/7 basis. (*Id.* at 188, 191-92.)

After the conference, Roger and Linda Durand left the hospital at approximately 4:00 or 4:30 p.m. and returned home to freshen up and so Roger could go to work. (Ex 2 at 109-10; Ex 4 at 90-91.) When he left the hospital, Roger Durand understood there "was a chance" his son could "take a turn for the worse" and he "wanted to stay," but he "couldn't be gone away from [his] job for too long." (Ex 4 at 95-96.)

Once they left the hospital, Roger and Linda Durand devised a plan that she would leave a voicemail for him at his workplace by using a teletype device (a TTY) at the hospital to advise him if their son "had a turn for the worse" and that he would ask his supervisor to "check his phone quite often, not just at the beginning and end of the shift" to see if there was a voicemail regarding his son. (*Id.* at 95, 99-100, 109-10; Ex 2 at 110-11.) Roger Durand provided a business card to his wife that included a telephone number for his employer's human resources department, a call into that number "just went to a recording and then" someone at the office "would check the messages." (Ex 4 at 99-102; Ex 16.) Prior to May 9, neither Linda Durand nor "anyone" else had ever contacted him at work, much less at the numbers he provided. (Ex 4 at 103-04.) Further, except for the numbers listed on the business card, there was no other way for anyone to contact him at work because he did not have access to email, he did not own a cell phone, and Linda Durand did not have any other telephone numbers for him. (*Id.* at 33-34, 104; Ex 2 at

125.) Priscilla Durand "didn't know anything" about her parents' plan "at the time." (Ex 3 at 212-13.)

Linda Durand returned to the hospital at approximately 8:00 p.m., testified that she eventually understood that "this was the end of his life at any time now … the time is coming now," and knew that she needed to contact her husband. (Ex 2 at 109, 112.) Linda Durand then went to the front desk on two occasions, "used [her] voice" to make a verbal request to Fairview employee Debra Huitt for a TTY, and a TTY was eventually brought to Shaun Durand's room for her use. (*Id*. at 112-18, 121-23; Ex 17 at 19-20; Ex 18.) Ms. Huitt did not immediately provide a TTY to Linda Durand when she first made the request because Ms. Huitt mistakenly believed they were only provided for patient use. (Ex 17 at 20-21.) However, Ms. Huitt agreed to provide the TTY when Linda Durand made a second request. (*Id*. at 23.) Before the initial request, Roger and Linda Durand had never advised anyone at Fairview that they needed a TTY or other communication device in Shaun Durand's room. (Ex 2 at 118; Ex 4 at 118.) Further, Linda Durand did not request an interpreter at any time once she returned to the hospital on May 9. (Ex 2 at 127.)

Ms. Huitt unpacked the TTY, provided Linda Durand with written instructions, and intended to set up the device, but Ms. Durand spilled a drink, became "flustered," and "waved … off" Ms. Huitt, who then left the room. (Ex 17 at 28-29, 34, 59, 67-68; Ex 3 at 214-15.) The written instructions state, "dial 9 (for outside line)," and were included with the TTY. (Ex 19; Ex 20 at 54-55, 78-79.) Linda Durand testified that she is "familiar with a TTY device, so she started plugging in the cords and making the

connections, getting it on, turning it on." (Ex 2 at 121-22.) However, she "kept getting a busy signal" and "couldn't get through" because she failed to dial 9 to get an outside line. (*Id*. at 121-23; Ex 3 at 220-21.)

During this same period of time, Priscilla Durand "called" her father's "work" and "got a machine," but "didn't leave a message" because she "wasn't sure if it was a machine that's even checked on … at that time of night, so [she] didn't leave a message." (Ex 3 at 216-17.) Her sister, Pauline Durand, also attempted to call her father's work, but "got a recording" and "tried" to leave a message. (Ex 21 at 89.) However, she does not know whether she actually left a message because she did not "know if [she] was supposed to push something or somehow send or – to get a message here or there or where" and she made no effort to call again. (*Id*. at 90.) Pauline Durand ultimately told her mother that she would not make any more calls because, according to Darlene Durand, "she was getting frustrated at that point because she was like 'I don't know what you want me to do. It goes to this answering machine. It's not going to do anything.'" (Ex 5 at 70.) Shaun Durand died before anyone contacted Roger Durand. (Ex 4 at 105-07.)

### Priscilla Durand's Personal Injury Claim

Priscilla Durand initially claimed Fairview's alleged violations of the law caused her to suffer "emotional injuries, including but not limited to, fear, anxiety, humiliation, and embarrassment." (Ex 1 at ¶¶ 40, 50, 58.) In her August 26, 2015 answers to interrogatories, she also claimed "emotional distress damages for disability discrimination" and stated she was "seeking fair compensation from the jury for [her]

emotional distress." (Ex 22 at Answer 9.) However, she did not claim any specific physical or emotional injuries and claimed that to mitigate her alleged damages her family "comforted and consoled one another through a difficult time" and "did not seek medical treatment for their emotional harm damages as a result of Defendant's discriminatory acts." (*Id*. at Answers 9, 10 and 15.)

During her December 9, 2015 deposition, Priscilla Durand initially asserted that she had not sought any medical, psychiatric, or psychological care arising out of her claimed injuries and acknowledged she was taking medication for anxiety and depression prior to May 2013. (Ex 3 at 237.) However, she claimed that she is now taking a "different" and "stronger" medication for these conditions because of Fairview's alleged discrimination. (*Id*. at 237-39.) She also claimed for the first time that she has experienced physical manifestations, including weight loss, exacerbation of her "other health conditions," and migraine headaches. (*Id*. at 242-46.)

Fairview served a second set of discovery and, in answers Priscilla Durand signed on February 4, 2016, she provided the names of ten medical providers that "may have information relevant to her claims in her complaint and deposition testimony[.]" (Ex 23 at Answer 1.) She also supplemented her initial interrogatory answers and claimed she "experienced depression, anxiety, headaches and/or migraines, and nausea as a direct and/or proximate result of the stress, discouragement, and emotional harm she experienced from her claims in this matter, for which she sought and will continue to seek medical treatment and services." (Ex 24 at Supplemental Answers 9 and 15.) Priscilla Durand claims medical bills totaling $62,761.61 and notes that her "damages

incurred from past and future medical expenses and the calculation used to arrive at said damage is continuing[.]" (*Id.*) She also provided a list of medical providers that she has seen to "reduce her anxiety, stress, headaches, and nausea" and a list of 16 medications that she had taken or had been prescribed since May 9, 2013, for these conditions. (*Id.* at Supplemental Answer 10.)

In correspondence dated March 23, 2016, Priscilla Durand's attorney noted that her client had "[i]nitially … only plead damages limited to 'garden variety' emotional harm; however, through the discovery phase of litigating her claims and during her deposition, Ms. Durand presented physical manifestations of the emotional distress she experienced on May 8-9, 2013 including depression, anxiety, and headaches." (Ex 25 at 1.)

Significantly, and although Priscilla Durand has asserted a personal injury claim beyond "garden variety" emotional distress, she has not disclosed the opinions of any witnesses qualified to opine regarding the nature, extent, duration, and cause of her alleged medical conditions. (*See generally* Exs 22-24.)

## LEGAL ARGUMENT

## I.     LEGAL STANDARDS

### A.     Summary Judgment.

Summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Eighth Circuit described the appropriate standard in considering summary judgment motions as follows:

> Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.... On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.... The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

*Wood v. SatCom Mktg., LLC*, 705 F.3d 823, 828 (8th Cir. 2013) (internal citation omitted). The court clarified that "'[a]lthough the burden of demonstrating the absence of any genuine issue of material fact rests on the movant, a nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial.'" *Id.* (internal citation omitted). "'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Id.* (internal citation omitted). "[T]o withstand a motion for summary judgment, the nonmovant must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial." *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1359-60 (8th Cir. 1993).

### B. ADA, RA, and MHRA.

Title III of the ADA prohibits any person who owns, leases, or operates a place of public accommodation from discriminating against an individual on the basis of that individual's disability in the full and equal enjoyment of the services of the public accomodation. *See* 42 U.S.C. § 12182(a); *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th

Cir. 2000) ("Title III of the ADA proscribes discrimination in places of public accommodation against persons with disabilities"). Similarly, Section 504 of the RA states that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). "The ADA has no federal funding requirement, but it is otherwise similar in substance to the Rehabilitation Act, and 'cases interpreting either are applicable and interchangeable.'" *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998) (internal citation omitted).

"Title III of the ADA does not provide for private actions seeking damages[.]" *Stebbins v. Legal Aid of Arkansas*, 512 Fed.Appx. 662, 663 (8th Cir. 2013). Instead, a private party may only seek injunctive relief under Title III. 42 U.S.C. § 121888(a)(1). A plaintiff may seek both injunctive relief and compensatory damages under Section 504 of the RA; however, compensatory damages may only be awarded if intentional discrimination is proven. 29 U.S.C. § 794a(a)(2); *Meagley v. City of Little Rock*, 639 F.3d 384, 388-90 (8th Cir. 2011).

Like the ADA and RA, the MHRA prohibits denying any person the full and equal enjoyment of the services of a public accomodation because of that person's disability. Minn. Stat. § 363A.11, subd. 1(a). MHRA claims are analyzed the same as claims under the ADA. *Somers v. City of Minneapolis*, 245 F.3d 782, 788 (8th Cir. 2001); *Nathanson v. Spring Lake Park Panther Youth Football Ass'n*, 129 F.Supp.3d 743, 749 (D.Minn. 2015) (citations omitted) (observing that the "Minnesota District Court has held that

federal precedent may be used to construe the MHRA and that analysis under the ADA controls a MHRA claim."). In analyzing the ADA, RA, and MHRA, this Court has held that "[e]ach statute prohibits discrimination on the basis of disability" and "[f]or analytic purposes, each is identical." *Loye v. Cnty. of Dakota*, 647 F.Supp.2d 1081, 1086 (D.Minn. 2009), *aff'd*, 625 F.3d 494 (8th Cir. 2010) (citations omitted).

## II. FAIRVIEW IS ENTITLED TO SUMMARY JUDGMENT ON THE CLAIMS BROUGHT BY ROGER AND LINDA DURAND.

### A. Elements of Roger and Linda Durand's ADA, RA, and MHRA Claims.

Fairview has admitted that it operates Ridges Hospital, "a place of accomodation," as defined by the ADA, that it receives funding from the United States Government and, therefore, is covered by Section 504 of the RA, and that it is an entity covered by the requirements of Minn. Stat. § 363A.11. (Ex 26 at ¶ XX; Ex 1 at ¶¶ 45, 52, 60.) Further, Fairview has admitted that Roger and Linda Durand are deaf and communicate, at least in part, via American Sign Language ("ASL") and, for purposes of this motion, does not contest that Roger and Linda Durand are qualified individuals with disabilities. (Ex 26 at ¶ VII; Ex 1 at ¶¶ 8-11.) Despite these admissions, Plaintiffs must still establish that Fairview discriminated against them based on their disability. *See Argenyi v. Creighton Univ.*, 703 F.3d 441, 447 (8th Cir. 2013).

Discrimination is defined by the ADA as a failure to "make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford … services … to individuals with disabilities, unless … taking such steps would fundamentally alter the nature of the … service … or would result in an

undue burden[.]" 42 U.S.C. § 12182(b)(2)(A)(ii). Discrimination is also defined as a "failure to take such steps as may be necessary to ensure that no individual with a disability is … treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii). Regulations promulgated under Title III of the ADA and the RA indicate that such steps may include furnishing "appropriate auxiliary aids and services" to individuals with disabilities when needed to ensure effective communication or when necessary to afford equal opportunity to benefit from the service in question. 28 C.F.R. § 36.303(c)(1); 45 C.F.R. § 84.52(d)(1).

The regulations advise that while public accommodations "should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, … the ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication." 28 C.F.R. § 36.303(c)(1)(ii). Indeed, "[t]he auxiliary aid requirement is a flexible one." *Feldman v. Pro Football, Inc.*, 419 Fed.Appx. 381, 392 (4th Cir. 2011) (internal citations omitted).

Further, while the ADA, RA, and MHRA are broad in scope, there is no requirement "to provide all requested auxiliary aids and services," only "necessary" auxiliary aids are required. *Argenyi*, 703 F.3d at 448; 28 C.F.R. § 36.303(c)(1); 45 C.F.R. § 84.52(d)(1). In analyzing what auxiliary aids or services are "necessary[,]" the Eighth Circuit has looked to the RA, applied a "meaningful access" standard, and held:

> Under a 'meaningful access' standard, we have decided that aids and services 'are **not required** to produce **the identical result** or level of achievement for handicapped and nonhandicapped persons,' but they

20

nevertheless 'must afford handicapped persons **equal opportunity to** ... **gain the same benefit**.' *Loye v. Cnty. of Dakota*, 625 F.3d 494, 499 (8th Cir. 2010) …. The Eleventh Circuit has similarly concluded that the 'proper inquiry' under the [RA] to determine if a hospital had provided 'necessary' auxiliary aids to a hearing impaired patient was whether the proffered aids 'gave that patient an **equal opportunity to benefit** from the hospital's treatment.' *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 343 (11th Cir. 2012).

*Argenyi*, 703 F.3d at 448 (emphasis added).

### B. Claims Related to Provision of an Interpreter.

The seminal case in the District of Minnesota relating to the provision of auxiliary aids and services to deaf individuals is *Loye*. While *Loye* was decided in the context of public entities (ADA Title II), rather than public accommodations (ADA Title III), the regulations promulgated under both require the provision of appropriate auxiliary aids where necessary to ensure effective communication and a reasonable modification in policies, practices, or procedures to avoid discrimination. 647 F.Supp.2d at 1088; 28 C.F.R. § 35.130(b)(7)(i); 28 C.F.R. § 35.160(a)(1), (b)(1); 28 C.F.R. § 36.302(a); 28 C.F.R. § 36.303(c)(1). Further, not only is *Loye* the leading case in this District on the issue, but the facts are analogous to those in this case.

In *Loye*, four deaf plaintiffs sued Dakota County for violating the ADA, RA, and MHRA, alleging that the county's response to a mercury contamination constituted discrimination because it failed to provide them with ASL interpreters during cleanup efforts and follow-up meetings. 647 F.Supp.2d 1081. In the weeks following the contamination, the county conducted several community meetings to update and explain the decontamination process, to provide counseling, and to answer questions. *Id.* at 1085.

The plaintiffs alleged that ASL interpreters were provided for some, but not all of the meetings. *Id.* Despite this, it was undisputed that even if ASL interpreters were not provided for all meetings, subsequent meetings were arranged where an interpreter was available and deaf individuals were given the opportunity to ask questions. *Id.* at 1091.

The Court in *Loye* noted that the "[p]laintiffs insist an interpreter is mandated for every meeting," but the Court held "[t]hey are incorrect." *Id.*; *see also Martin v. Halifax Healthcare Sys., Inc.*, 621 Fed.Appx. 594, 603 (11th Cir. 2015) (no requirement to provide "round-the-clock" interpreters). The Court "decline[d] to hold an interpreter must absolutely be provided for every meeting, regardless of the circumstances." *Id.* Instead, the Court held that "[t]he Supreme Court's balance between effecting the statutory objectives and maintaining manageable bounds … reasonably means **not every event can be interpreted in real time**." *Id.* (emphasis added). "There must, however, be effective communication and, when needed, reasonable modifications." *Id.* The Court then held that "[i]f no interpreter was present at a particular meeting" it is "a reasonable modification to afford deaf plaintiffs **an opportunity** to learn the information presented at the meeting and ask questions within a reasonable time." *Id.* (emphasis added).

In this case, Plaintiffs appear to allege that to comply with the ADA, RA, and MHRA, an interpreter was required for every contact with Fairview staff while Roger and Linda Durand were at Ridges Hospital. (*See* Ex 24 at Answer 2.) This argument was soundly rejected in *Loye*. 647 F.Supp.2d at 1091. Fairview was not required to provide an interpreter for every contact with Roger and Linda Durand, but, pursuant to *Loye*, could instead provide effective communication and reasonable modifications by

affording Roger and Linda Durand the opportunity to learn information and ask questions at a later meeting. *Id.* That is exactly what happened.

Nurse Klopp held a conference with Roger and Linda Durand, an interpreter, Priscilla Durand, and other family members on May 8. The purpose of that conference was to provide information regarding Shaun Durand's diagnosis and prognosis, to explain what decisions had been made, and to provide an opportunity to ask questions and understand what was going on, including the decision to elect comfort care. Dr. Malik also met with Roger and Linda Durand with an interpreter that same day. Further, Nurse Klopp convened another conference on May 9, where an interpreter was present for Roger and Linda Durand. During that conference comfort care and the dying process were again discussed. They also discussed whether to keep Shaun Durand in the hospital and that he would be moved out of the ICU. Also, Roger and Linda Durand were given the opportunity to ask questions during both conferences with Nurse Klopp and the meeting with Dr. Malik.

Pursuant to *Loye*, there is simply no support for any claim in this case that the ADA, RA, or MHRA required that an interpreter be present for every contact with Fairview staff while Roger and Linda Durand were in the hospital. 647 F.Supp.2d at 1091. Instead, the question is whether effective communication was provided to Roger and Linda Durand. *Id.* In *Loye*, the Court held that effective communication was provided when the plaintiffs were given the opportunity to ask questions at a subsequent meeting even if an interpreter was not provided at an earlier meeting. *Id.* Roger and

Linda Durand were undisputedly given that opportunity and, as such, they were provided effective communication.

In addition, while Plaintiffs acknowledge that interpreters were present for the conferences with Nurse Klopp and the meeting with Dr. Malik, they claim Roger and Linda Durand did not receive certain information, including that their son's death was imminent and what the term "comfort care" meant. But Plaintiffs acknowledge that Nurse Klopp and Dr. Malik discussed Shaun Durand's comfort and Nurse Klopp discussed how Shaun was doing and what was being done as far as comfort care. However, Roger and Linda Durand claim they did not know what the phrase "comfort care" meant. But the information Roger and Linda Durand received during the conferences was the same information everyone else received during the conferences. Priscilla Durand testified that during the conference with Roger and Linda Durand, the interpreter, and other family members, Nurse Klopp talked about the fact that Shaun Durand was going to be on comfort care, but "[s]he didn't go over what comfort care was." (Ex 3 at 146.) In addition, Priscilla Durand testified that Nurse Klopp never said the words "Shaun is dying[.]" (*Id.* at 147.) Based on Plaintiffs' own testimony, Roger and Linda Durand undisputedly received the same information the other family members received during the conference. Accordingly, it cannot be said that Fairview failed to provide necessary auxiliary aids and services to ensure effective communication, because the communication was clearly effective.

What Plaintiffs seem to argue is that Fairview had an obligation to ensure Roger and Linda Durand understood the information that was provided. This is akin to

requiring that Fairview guarantee comprehension. Not only would such a standard be impossible to meet, it is not what is required under the law. Fairview is not required to guarantee comprehension or even "produce the identical result or level of achievement for handicapped and nonhandicapped persons[.]" *Argenyi*, 703 F.3d at 448. Instead, the auxiliary aids and services must afford "equal opportunity to ... gain the same benefit." *Id.* That was clearly done in this case.

Any misunderstanding that Roger and Linda Durand claim to have had could have been mitigated if they simply asked for additional information. There is no evidence to suggest that Plaintiffs asked Nurse Klopp or Dr. Malik to explain what the term "comfort care" meant or to explain what that meant in relation to Shaun Durand's dying process. Instead, Linda Durand claimed that "if [she] had more information, [she] would have asked more questions"; however, it can also be said that if she had asked more questions she would have had more information. (Ex 2 at 70.) Further, Roger Durand testified that he did not ask questions because he did not feel that it was his place to do so given his relationship with his son. Effective communication is accomplished when, as here, interpreters are provided at subsequent meetings and an opportunity to ask questions is given. *See Loye*, 647 F.Supp.2d at 1091. Fairview cannot be faulted for Roger and Linda Durand's failure to ask questions when given the opportunity. *Id.*

Because Plaintiffs cannot establish that Fairview failed to provide auxiliary aids and services necessary to ensure effective communication, Plaintiffs cannot show that Fairview discriminated against them based on their disability. The Court should grant Fairview's motion accordingly.

### C.      Plaintiffs' Claims Related to Provision of a TTY.

Plaintiffs also claim discrimination related to the provision of a TTY to Linda Durand on May 9. This Court has held that the ADA, RA, and MHRA each "prohibit[] discrimination on the basis of disability[.]" *Loye*, 647 F.Supp.2d at 1086. Fairview, through Ms. Huitt, did not provide a TTY to Linda Durand immediately upon her request; however, the delay in providing the TTY was not based on Linda Durand's disability, but instead on the mistaken understanding that TTYs were only for patient use. This is not "discrimination on the basis of disability" and is not a violation of the ADA, RA, or MHRA.

Further, at the summary judgment stage, to have Article III standing a plaintiff must come forward with, among other things, evidence establishing "a causal connection between the injury and the conduct complained of[.]" *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1145 (11th Cir. 2014) (citations omitted). Plaintiffs must show that Fairview's delay in providing a TTY was the reason Linda Durand could not contact her husband to inform him of their son's impending death. Plaintiffs cannot make such a showing.

The facts establish that it was not any delay on the part of Fairview that prevented Linda Durand from contacting Roger Durand. Instead, it was a series of circumstances that had nothing to do with Fairview. The plan Plaintiffs devised entailed Linda Durand calling Roger Durand's work and leaving a message for him. While waiting for the TTY, Priscilla and Pauline Durand attempted to call their father's work and Pauline tried to leave a message. Despite these efforts, Roger Durand did not receive a message before

his son died.  No reasonable jury could find that Roger Durand would have received a message from Linda Durand if he did not receive the message Pauline Durand attempted to leave.

Further, after receiving the TTY, Linda Durand attempted to call her husband's work, but was unable to get an outside line because she did not dial 9 despite the instructions indicating that needed to be done.  The reason she was unable to contact her husband was not because of any delay in providing a TTY, but instead was because Linda Durand failed to read the instructions provided with the TTY and dial 9 to get an outside line.

Roger and Linda Durand cannot establish that Fairview's delay in providing the TTY had anything to do with their disability and they cannot establish that any such delay was the reason Linda Durand was unable to contact her husband.  Fairview is, accordingly, entitled to summary judgment.

## III. FAIRVIEW IS ENTITLED TO SUMMARY JUDGMENT ON PRISCILLA DURAND'S CLAIMS

### A. Priscilla Durand has Not Alleged and Cannot Establish that Fairview Excluded, Denied Benefits To, or Discriminated against Her.

While it is "widely accepted that under both the RA and ADA, non-disabled individuals have standing to bring claims when they are injured because of their association with a disabled person[,]" those claims are limited.  *McCullum*, 768 F.3d at 1142 (citations omitted).

> The section of the ADA conferring standing on a non-disabled party states that '[i]t shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other

opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.'

*Id.* (*quoting* 42 U.S.C. § 12182(b)(1)(E). As the Eleventh Circuit held:

On its face § 12182(b)(1)(E) recognizes only certain kinds of injuries that may form the basis of an ADA suit brought by a non-disabled individual. The text makes clear that **a non-disabled individual has standing** to bring suit under the ADA **only if she was personally discriminated against or denied some benefit** because of her association with a disabled person.

*Id.* (citations omitted) (emphasis added). Further, the RA provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 … shall be available to any person aggrieved by any act or failure to act[.]" 29 U.S.C. § 794a(a)(2); *see also McCullum*, 768 F.3d at 1143.

The "threshold for associational standing under both the RA and the ADA is the same: **non-disabled persons have standing** to seek relief under either statute **only if they allege that they were personally excluded, personally denied benefits, or personally discriminated against** because of their association with a disabled person." *McCullum*, 768 F.3d at 1143 (emphasis added). The Eleventh Circuit analyzed associational standing in the context of a non-disabled person seeking relief under the ADA and RA for not providing an ASL interpreter in a hospital – facts nearly identical to Priscilla Durand's claim. *Id.* The Eleventh Circuit "[r]eject[ed] the contention that non-disabled individuals may seek relief under the RA and ADA for injuries other than exclusion, denial of benefits, or discrimination that they themselves suffer," holding "[i]f that contention were correct, it would mean that Congress granted non-disabled persons more rights under the ADA and RA than it granted to disabled persons, who can recover

only if they are personally excluded, denied benefits, or discriminated against on the basis of their disability." *Id.*.

Priscilla Durand's claims are premised solely on Fairview's alleged failure to provide her parents with an interpreter and because she allegedly had to "interpret" for them. Even if Fairview failed to provide interpreters for Roger and Linda Durand, Priscilla Durand has failed to allege or establish how Fairview "excluded, denied benefits to, or discriminated against" her. *See McCullum*, 768 F.3d at 1143. The facts establish that Priscilla Durand was never excluded from Shaun Durand's medical care or decision-making and she was not otherwise excluded, denied benefits, or discriminated against by Fairview. She thereby fails to meet the threshold for associational standing and her claims should be dismissed.

Plaintiffs may attempt to argue that a change in regulations eviscerates the Eleventh Circuit's holding in *McCullum* and allows Priscilla Durand's claim to go forward. Effective March 15, 2011, 28 C.F.R. § 36.303(c) was amended to include a provision stating that "[a] public accommodation shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication, except" under certain circumstances. But any such argument that this new provision eviscerates *McCullum* is a red herring.

It is important to note that it does not appear any court has overruled the holding in *McCullum*. Further, the Eleventh Circuit based its holding on interpretation of the statutory provisions of the ADA and RA that confer associational standing, not the

regulations promulgated under those statutes. *See McCullum*, 768 F.3d at 1142-45. Accordingly, a change in the regulations would not affect the holding.

It is also helpful to review the Department of Justice's own guidelines and comments regarding the changes in the regulation. The DOJ stated that the provisions of 28 C.F.R. § 36.303(c) that took effect March 15, 2011, "do not impose new obligations on places of public accommodation. 28 C.F.R. § Pt. 36, App. A. Rather, these provisions simply codify the Department's longstanding positions." *Id.* Because the new regulations "do not impose new obligations on places of public accomodation[,]" but instead, "simply codif[ied] … longstanding positions[,]" it cannot be said that the change diminishes the holding in *McCullum*. *See id.* Moreover, despite the new regulations being effective since March 15, 2011, Fairview has been unable to identify a case where a court has recognized a cause of action by a non-disabled person against a public accomodation premised on a violation of § 36.303(c)(3). *See McCullum*, 768 F.3d at n. 5 (the Court had "no occasion to decide whether a plaintiff may assert a cause of action premised on a violation of § 36.303(c)(3)). Even if such a cause of action was available, the DOJ guidelines establish that it would not apply in this case.

Further, the DOJ guidelines establish that the new provisions of § 36.303(c) were promulgated to prevent public accommodations from "requiring or forcing" disabled persons to bring other individuals with them to facilitate communication and from coercing another adult to provide effective communication. *See* 28 C.F.R. § Pt. 36, App. A. Such force or coercion cannot be shown in this case. Significantly, Priscilla Durand, as an employee of Fairview, knew at the time Shaun Durand was in the hospital that

Fairview could not force her to interpret for her parents. (Ex 3 at 117.) She also testified that she was never "pressure[d]" to interpret and was never told that Fairview staff would not get an interpreter for her parents because they wanted her to interpret. (*Id.* at 168, 170.) Priscilla Durand's own testimony establishes that she was never coerced, forced, or required to interpret.

Finally, Plaintiffs may cite to the holding in *Loeffler v. Staten Island Univ. Hosp.* (decided prior to the effective date of 28 C.F.R. 36.303(c)(3)) to argue that Priscilla Durand's claims are viable. 582 F.3d 268 (2nd Cir. 2009). But any such argument is misplaced because the "extreme facts" in *Loeffler* distinguish it from this case and establish that a recovery should be limited to instances involving circumstances where the public accomodation required, forced, or coerced individuals to provide effective communication. *See McCullum*, 768 F.3d at 1144-45. As *McCullum* observed, the plaintiffs in *Loeffler* "repeatedly asked hospital officials to provide a sign language interpreter for their deaf father [the patient], but those requests were persistently ignored or 'laughed off.'" *Id.* at 1145. Instead, the hospital "conscripted" the patient's children to serve as interpreters, "going so far as to give one of the children a pager so she could be 'on call,' and causing both children to miss more than a week of school." *Id.* These "extreme facts" are entirely absent here.

Priscilla Durand cannot meet the threshold for associational standing because she has not alleged and cannot establish that Fairview excluded, denied benefits to, or discriminated against her. Fairview is, therefore, entitled to summary judgment as a matter of law.

**B.**      **Priscilla Durand's Personal Injury Claims are Not Supported by Expert Testimony.**

Even if the Court concludes that Priscilla Durand has met the threshold for associational standing, she is not entitled to seek damages for anything other than "garden variety" emotional distress.

Priscilla Durand seeks damages for emotional distress, claiming she experienced depression, anxiety, weight loss, nausea, worsening of her headaches and/or migraines, and exacerbation of "other health conditions[.]" She also claims to take "different" and "stronger" medication because of Fairview's alleged discrimination and claims she is or has taken 16 different medications to allegedly reduce her anxiety, depression, headaches, and nausea. She concedes her personal injury claims are more than "garden variety" in nature but she has failed to identify an expert witness qualified to opine regarding her alleged medical conditions and their cause.

"Garden variety" emotional distress claims generally need not be supported by expert testimony, but expert testimony is required for claims involving more "sophisticated" injury. *See Flowers v. Owens*, 274 F.R.D. 218, 220 (N.D. Ill. 2011); *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006). Expert testimony is particularly important when, as here, preexisting conditions are involved. *See Halcomb v. Woods*, 610 F.Supp.2d 77, 85 (D. D.C. 2009) (expert testimony is necessary to prevent the jury from speculating as to causal link between a defendant's act and a plaintiff's harm in cases presenting complicated medical questions due to multiple and/or preexisting causes) (citations omitted).

It is clear that Priscilla Durand does not claim simple "garden variety" emotional distress. Instead, she is claiming severe emotional distress with attendant psychological diagnoses (anxiety, depression) and physical manifestations (weight loss, nausea, worsening of headaches). These claims must be supported by expert testimony, but she has failed to do so. *See Schrum v. Burlington N. & Santa Fe Ry. Co.*, 286 Fed.Appx. 380, 381 (9th Cir. 2008) (aggravation of pre-existing asthmatic condition is not the kind of obvious injury that could be presented to a jury without expert testimony). Priscilla Durand should, therefore, be precluded from claiming damages beyond "garden variety" emotional distress.

## IV. FAIRVIEW IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' INJUNCTIVE RELIEF CLAIMS.

Plaintiffs seek injunctive relief under the ADA, RA, and, for Roger and Linda Durand, the MHRA. But to survive summary judgement, Plaintiffs must establish they have standing to assert such a claim. *McCullum*, 768 F.3d at 1145. "A plaintiff has standing to assert a claim for injunctive relief only when the threatened harm is real and immediate, not conjectural or hypothetical." *Id.* (citations omitted).

In support of their injunctive relief claim , Plaintiffs allege that they "presently and from time to time visit Defendant's hospitals and clinics" and "Plaintiff Roger and Linda Durand's other children will visit Defendant's hospitals and clinics in the future for medical care and treatment." (Ex 1 at ¶¶ 37-38.) Indeed, Roger Durand has "[s]ometimes" gone to Fairview clinics or hospitals "for the cardiology," but has only presented there about "two times a year." (Ex 4 at 119-21.) Linda Durand does not treat

at Fairview and last did so in "[m]aybe 1999, 2000." (Ex 2 at 128-29; *see also* Ex 3 at 232.) Despite these allegations, Plaintiffs cannot establish standing for injunctive relief claims because it is mere speculation they will return to Fairview.

Indeed, a mere assertion that a plaintiff will return to a defendant hospital is not sufficient to establish a "real and immediate threat[.]" *McCullum*, 768 F.3d at 1145-46; *see also Silva v. Baptist Health S. Florida, Inc.*, 139 F.Supp.3d 1319, 1339-40 (S.D. Fla. 2015). In *Silva*, the Court held that the plaintiff "repeatedly" stating a preference to return to the defendant hospital and claiming she would "return '[d]ue to many factors, including the location of [her] doctors, the fact that [d]efendants have all of [her] medical records and history, the proximity to [her] home, and history of prior care/treatment" were insufficient to establish a "real and immediate threat" of harm necessary to establish standing. 139 F.Supp.3d at 1339-40. In addition, the Court held that another plaintiff's assertion that "due to his father's 'ongoing health concerns and required follow-up,' he will also likely visit [d]efendants' hospitals as a companion in the future" was insufficient to establish standing. *Id.* at 1340.

Plaintiffs offer even less "evidence" of a real and immediate threat of harm than the plaintiffs in *Silva*. Here, Plaintiffs do not even claim, as did the plaintiffs in *Silva*, that they or any family member will likely be hospitalized at Fairview in the future. Even if they did, such a claim, without more, would still be insufficient to establish standing to assert a claim for injunctive relief. *See id.* at 1339-40; *McCullum*, 768 F.3d at 1145-46. Because Plaintiffs have failed to establish standing to claim injunctive relief, the Court should dismiss their claims for such relief under the ADA, RA, and MHRA.

## CONCLUSION

For all of these reasons, Fairview respectfully requests that the Court dismiss Plaintiffs' claims as a matter of law.

Respectfully submitted,

Date: November 8, 2016

/s/Matthew S. Frantzen
Matthew S. Frantzen #332793
Ryan C. Ellis #386661
Marissa K. Linden #395564
GISLASON & HUNTER LLP
Attorneys for Defendant
701 Xenia Avenue South, Suite 500
Minneapolis, MN 55416
Phone: (763) 225-6000

2054375.1