# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Roger Durand, *et al.*,

               Plaintiffs,

v.

Fairview Health Services,

               Defendant.

Civ. No. 15-2102 (RHK/SER)
**MEMORANDUM OPINION AND ORDER**

---

Heather M. Gilbert, Terra L. Frazier, Gilbert Law PLLC, Roseville, Minnesota, for Plaintiffs.

Matthew S. Frantzen, Marissa K. Linden, Ryan C. Ellis, Gislason & Hunter LLP, Minneapolis, Minnesota, for Defendant.

---

## INTRODUCTION

On May 9, 2013, Shaun Durand died after three days in intensive care at Fairview Ridges Hospital ("the Hospital") in Burnsville, Minnesota. Shaun's parents, Roger and Linda Durand, and his sister, Priscilla Durand, then commenced this action against Defendant Fairview Health Services ("Fairview"), operator of the Hospital, alleging that it violated federal and state law by failing to provide auxiliary aids for Roger and Linda—both of whom are deaf—during Shaun's hospitalization. Presently before the Court are the parties' cross-Motions for Summary Judgment.[1] For the reasons set forth below, Fairview's Motion will be granted and the Durands' Motion will be denied.

---

[1] Also pending are the parties' cross-Motions to Exclude Expert Testimony pursuant to Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

**BACKGROUND**

The record reveals the following undisputed facts. Roger and Linda are deaf, but their six children, including Priscilla and Shaun (the decedent), can or could hear. (L. Durand Dep. 31.) The children learned to communicate with Roger and Linda through a combination of speaking/lip-reading, Pidgin (a simplified form of non-verbal communication), and American Sign Language ("ASL"). (Id.) Thus, they are able to communicate even though they have received no formal sign-language training. Roger and Linda also used e-mail to communicate, and Linda used a "Sidekick" mobile phone to send e-mails and text messages. (Id.)

Roger and each of the Durand children suffer from Marfan syndrome in various degrees.[2] (R. Durand Dep. 42; L. Durand Dep. 38.) Shaun was first diagnosed at the age of seven. (L. Durand Dep. 37.) By early 2013, he had undergone two major heart surgeries and been diagnosed with congestive heart failure. (Id. 43, 47–49.) Linda was aware of his diagnosis and was present for both surgeries. (Id. 48.) On February 11, 2013, Shaun, who was then 31 years old, executed a health care directive designating Priscilla to "represent [his] wishes and make [his] health care decisions" in the event he was unable to do so. (Frantzen Aff. Ex 9.) He further indicated he "would not want Roger, Linda, or Pauline Durand present" if he was near death. (Id.)

---

Since the Court concludes summary judgment is warranted, it need not and does not reach those Motions.

[2] Marfan syndrome is a "hereditary connective tissue disorder that affects most notably the skeleton, heart, and eyes." Marfan syndrome, Britannica Academic, http://academic.eb.com/ levels/collegiate/article/50845 (last visited Jan. 12, 2017). Heart problems are common among affected individuals, and rupture of the aorta is the most common cause of death. (Id.) It is not deadly in all cases; some individuals live essentially normal lives. (Id.)

By April 2013, Priscilla understood Shaun's "lifespan was likely limited," and so did her parents; Priscilla "always tr[ied] to relay" information concerning his condition to her parents.  (P. Durand Dep. 121–22).  The events at issue began one month later, on May 7, when Priscilla brought Shaun to the Hospital after an "exacerbation of his congestive heart failure."  (P. Durand Dep. 130.)  He was admitted to the Hospital's intensive-care unit ("ICU"), and Roger and Linda learned of his hospitalization the next day.

**I.     May 8**

Both Priscilla and her sister, Darlene, alerted Roger and Linda to Shaun's hospitalization.  Sometime after 11:00 a.m. on May 8, Darlene went to Roger's and Linda's home.  (D. Durand Dep. 37–38.)  She "told [her] parents 'Don't go to work.  You guys really need to come up to the hospital right away. . . . This is probably going to be it.'"  (Id. 38.)  In addition, Priscilla e-mailed Linda and said they "should see [Shaun] right away."  (L. Durand Dep. 58.)  At approximately 1:30 p.m., Roger and Linda arrived at the Hospital and joined family members in Shaun's room.  (Id. 59; R. Durand Dep. 65.)  Linda described her arrival as "a very confusing time" (L. Durand Dep. 62), and Roger testified his children "got [them] up to speed on what they knew so far" (R. Durand Dep. 65).  Almost immediately, Linda went to a nurse's station and requested a live ASL interpreter.  (L. Durand Dep. 62.)

Shortly after 1:30 p.m., Fairview "advanced practice" nurse Amy Klopp convened a care conference in Shaun's room with Roger, Linda, and other members of the Durand family.  (Klopp Dep. 8; L. Durand Dep. 62, 68.)  Priscilla requested a live ASL

interpreter for Roger and Linda (Klopp Dep. 45), yet the conference occurred without one. (L. Durand Dep. 63.) Linda attempted to follow Klopp by reading her lips, but she "missed out on a lot" of information; there were "some things that [she] couldn't understand at all." (Id. 62.) She testified that Priscilla "volunteer[ed] as best she could" to sign the information Klopp was conveying, but she "didn't want [Priscilla] to do that because it was so overwhelming." (Id. 64.) Linda could not recall what information she gleaned from reading lips. (Id.) This conference lasted approximately one hour and thirty minutes, during which time "decisions were made to focus on comfort care[]," or end-of-life care. (Id. 62; Frantzen Aff. Ex. 12 at 13.)

At 2:46 p.m., Fairview requested on-site ASL interpreter services. An interpreter arrived at the Hospital approximately one hour later. (Frantzen Aff. Ex. 12). With the aid of the interpreter, Roger, Linda, and Priscilla then met with Klopp. (L. Durand Dep. 68.) Klopp testified she had no memory of this conference, but that she customarily would have discussed Shaun's "current state and the care up to [that] point," as well the earlier "decision to focus on comfort for [Shaun]." (Klopp Dep. 178.) Indeed, Roger testified that Klopp "talked about what they were doing with Shaun," including the focus on "comfort care," but he did not know what the term meant. (R. Durand Dep. 67.) He thought "they were just keeping [Shaun] comfortable" with medicine and pain reduction. (Id. 67–68.) Linda testified she recalled "something about comforting [Shaun]," but she did not "understand the terminology." (L. Durand Dep. 68, 70.) According to Priscilla, Klopp reiterated that Shaun would "be on comfort care," but she did not "go over what comfort care was." (P. Durand Dep. 146.)

Roger and Linda acknowledge they had the opportunity to ask Klopp questions through the ASL interpreter. (L. Durand Dep. 70–71; R. Durand Dep. 70–71.) Roger did not ask questions because "the doctors were in a hurry and [he] didn't have time . . . [He] didn't want to keep them." (R. Durand Dep. 71.) He also felt that "because of [his poor] relationship with Shaun, [he] didn't really feel like [he] had the right to [ask questions]." (Id.) Instead, he "just wanted to be there for [Shaun]," and he "pretty much let Priscilla explain . . . what was going on." (Id.) Roger did not recall Linda asking questions. (Id.) Linda testified that she did ask questions but Klopp did not answer all of them because Linda "knew there was more discussed" earlier. (L. Durand Dep. 71–72.) She could not recall any specific question she asked. She testified that this meeting lasted fifteen minutes. (Id. 72.)

Later that evening, around 5:00 p.m., Shaun's physician, Dr. Faiqa Malik, held a meeting in Shaun's room. (Id. 75–76.) No interpreter was present when this meeting began, but one arrived near the end. (Id. 77–78, 83.) Linda recalled a conversation about "comforting" Shaun, but she could not remember exactly what Dr. Malik said. (Id. 87.) Linda had the opportunity to ask questions through the interpreter but could not recall whether she did so. (Id. 88.) Roger also had the opportunity to ask Dr. Malik questions but did not do so. (R. Durand Dep. 71.) Linda described this meeting as "short" (L. Durand Dep. 76), although interpreter records indicate Fairview paid the interpreter from 3:44 p.m. to 6:00 p.m. that day (Frantzen Aff. Ex. 13).

After 6:00 p.m., Roger and Linda identify three instances when Shaun received medical attention with no interpreter present. (Doc. No. 89 at 6.) First, Fairview staff

deactivated Shaun's defibrillator, a decision made earlier in the day by Priscilla. (L. Durand Dep. 92.) Linda was unaware of this decision, and she did not understand what had happened until Priscilla explained it to her. (Id.) Second, around 8:30 p.m., Shaun experienced a "really bad" seizure. (P. Durand Dep. 181–82.) Dr. Karen Dorn responded, stabilized Shaun, and discussed his status and treatment with Priscilla. (Id.) Third, Shaun again experienced "twitching" and "seizure-like activity" around 11:00 p.m. (Doc. No. 90-10), and no interpreter was present when Fairview staff responded (although Roger and Linda do not assert that any information was conveyed during or after this incident (see Doc. No. 89 at 6)). Despite the absence of interpreters at these times, Roger testified he "knew generally what was happening" that evening. (R. Durand Dep. 83.) He never asked Priscilla what decisions she had made regarding Shaun's care. (Id.)

**II.    May 9**

Roger and Linda identify two additional instances when Shaun received medical care the following morning with no interpreter present. At 8:35 a.m., a Fairview nurse made rounds and cared for Shaun, but no interpreter was present, so Roger and Linda did not receive information the nurse conveyed. They instead turned to Priscilla for updates. (Doc. No. 90-10; P. Durand. Decl. ¶ 24.) Before 9:00 a.m., a doctor visited Shaun without an interpreter present, and Roger and Linda again turned to Priscilla for help understanding the situation. (R. Durand Dep. 85; Doc. No. 90-10.) Fairview requested an interpreter at 10:00 a.m., and an interpreter arrived at noon. (Doc. No. 85-20.)

With the interpreter, Roger, Linda, and other members of the Durand family met with Klopp a second time and discussed Shaun's prognosis. (L. Durand Dep. 101–02.) Linda recalls learning that her family was not comfortable taking Shaun home because they did not think they would be able to care for him. (Id. 105.) She also understood that Shaun was going to be transferred out of the ICU because "he wasn't going to receive more care." (Id. 106–08.) Nobody told her or Roger that Shaun might die that day. (Id.; R. Durand Dep. 92.) Linda could not recall the duration of this meeting. She testified that she asked no questions. (L. Durand Dep. 101–03.)

Roger and Linda left the Hospital around 4:00 p.m. (Id. 109; R. Durand Dep. 91.) Roger was scheduled to work that evening and, with the belief that he would "see [Shaun] the next day," he decided to work rather than return to the Hospital. (R. Durand Dep. 92.) He and Linda then devised a plan for her to contact him at work in the event of an emergency with Shaun: Linda would request a teletypewriter ("TTY")[3] from Fairview and use it to leave a message on a voice mailbox at Roger's work. (L. Durand Dep. 111; Id. 99–100.) Roger left Linda with a number to call and, when he arrived at work, he asked his supervisor to check for messages often. (R. Durand Dep. 101–02, 105.) He explained what was happening with Shaun and that "[Shaun] was close. He was close. You never know when you're going to hear something." (Id. 105.) His supervisor agreed to check for messages often, and Roger asked repeatedly whether anyone had called. (Id.) Nobody had used this method to call Roger at work before, and there was no other way to reach him. (Id.)

---

[3] A TTY allows a hearing-impaired individual to place a telephone call via a relay service.

Linda returned to the Hospital around 8:00 p.m. (L. Durand Dep. 109.) Almost immediately, she realized Shaun was dying and "knew at that instant [she] needed to contact [Roger]." (Id. 112.) She requested a TTY from Fairview nurse Debra Huitt (id.), but Huitt denied her request, stating Fairview only provided TTYs to patients (Huitt Dep. 20–21). Linda then asked Priscilla to call Roger's work; Priscilla did so, but she did not leave a message. (P. Durand Dep. 216–17 ("I guess I listened to [a recording] and I wasn't sure if it was a machine that's even checked on . . . at that time of night, so I didn't leave a message.").) After an hour, Linda renewed her request for a TTY, and Huitt retrieved one. (L. Durand Dep. 114; Huitt Dep. 23.)

Linda, however, was ultimately not able to call Roger. According to Huitt, she retrieved the TTY box, brought it to Shaun's room, put it on the table, and unpacked it. (Huitt Dep. 28.) Then Linda picked the device up and began making connections. In doing so, she became "flustered," and waived Huitt off. (Id. 29; P. Durand Dep. 215.) According to Linda, Huitt "obviously didn't understand how to connect" the TTY and, since she was "familiar with a TTY device, [she] started plugging in the cords and making the connections." (L. Durand Dep. 121, 122.) She repeatedly attempted to call but heard a busy signal. (Id. 115.) She later learned she had to dial "9" to access an outside line. (Id. 123.) She testified that no instructions[4] were provided and Huitt "even took the box" for the TTY when she left Shaun's room. (Id.) As Linda was attempting to reach Roger, Shaun died. (L. Durand Dep. 115–16.) A physician entered Shaun's room

---

[4] Fairview's TTY instructions provide (in boldface): "On the telephone keypad dial 9 (for outside line)." (Frantzen Aff. Ex. 19.)

shortly thereafter to pronounce his death, and no interpreter was present. At Linda's behest, police located Roger and informed him of Shaun's death.

On April 23, 2015, nearly two years after Shaun died, Roger, Linda, and Priscilla commenced this action. They allege Fairview violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Rehabilitation Act ("RA"), 29 U.S.C. § 794, and state law by failing to provide sufficient auxiliary services (*i.e.,* ASL interpreters and a TTY) and by relying on Priscilla to "interpret" for Roger and Linda. All parties have moved for summary judgment.[5] The Motions have been fully briefed, and the Court heard argument on December 15, 2016. The Motions are ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007). The nonmoving party may not rest on

---

[5] The Durands' Motion is partial, asking the Court determine as a matter of law that (1) Fairview had an obligation to provide Roger and Linda auxiliary aids; (2) Fairview discriminated against Linda by denying her access to a TTY; and (3) Fairview discriminated against Roger, Linda, and Priscilla by relying on Priscilla to interpret for Roger and Linda.

mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078–79 (8th Cir. 2008).

Where, as here, the Court confronts cross-motions for summary judgment, this approach is only slightly modified. When considering the Durands' Motion, the Court views the record in the light most favorable to Fairview, and, when considering Fairview's Motion, the Court views the record in the light most favorable to the Durands. "Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact." Seaworth v. Messerli, Civ. No. 09-3437, 2010 WL 3613821, at *3 (D. Minn. Sept. 7, 2010) (Kyle, J.), aff'd, 414 F. App'x 882 (8th Cir. 2011).

## ANALYSIS

Title III of the ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). Similarly, the RA provides: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Minnesota law provides similar protections. See Minn. Stat. § 363A.11. The Eighth Circuit has described these statutes as "similar in substance," and, hence, has treated "case law interpreting them as

'interchangeable.'" Argenyi v. Creighton Univ., 703 F.3d 441, 448 (8th Cir. 2013) (quoting Gorman v. Bartch, 152 F.3d 907, 912 (8th Cir. 1998)); Somers v. City of Minneapolis, 245 F.3d 782, 788 (8th Cir. 2001) ("Claims under the MHRA are analyzed the same as claims under the ADA.").

**I.    Roger, Linda, and interpreters**

Roger and Linda first allege Fairview discriminated against them based on their disability by failing to provide qualified ASL interpreters for "many significant interactions" with Shaun's healthcare providers.[6] (Doc. No. 89 at 5, 10–13.) To prevail, they must show (1) they are disabled; (2) the Hospital is a "place of public accommodation (for ADA purposes) and receives federal funding (for [RA] purposes);" and (3) Fairview discriminated against them based on their disability. Argenyi, 703 F.3d at 447 (quoting Mershon v. St. Louis Univ., 442 F.3d 1069, 1076–77 (8th Cir. 2006)). Fairview acknowledges that Roger and Linda are disabled and that it is a federally-funded place of public accommodation. (Doc. No. 82 at 19.) The question, then, is whether Fairview discriminated against Roger and Linda based on their disability. In the Court's view, the answer must be "no."

The ADA defines discrimination to include "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded . . . or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii). Regulations require a public accommodation

---

[6] Following the parties' lead, the Court analyzes Roger's and Linda's claims together with respect to Fairview's alleged failure to provide interpreters.

to "furnish *appropriate* auxiliary aids and services when necessary to ensure *effective communication* with individuals with disabilities," including "companions who are individuals with disabilities."[7]  28 C.F.R. § 36.303(c)(1) (emphases added); see also 45 C.F.R. § 84.52(d) (the RA requires the provision of "appropriate auxiliary aids . . . where necessary to afford [disabled] persons an equal opportunity to benefit from the service in question").  Auxiliary aids include qualified sign-language interpreters and communication devices such as TTYs.  28 C.F.R. § 36.303(b)(1).  Whether providing auxiliary aids resulted in effective communication is a fact-intensive inquiry.  Argenyi, 703 F.3d at 449.

The type of services Roger and Linda sought from Fairview necessarily informs the Court's analysis.  The ADA and RA "do not require institutions to provide all requested auxiliary aids and services," but only those that are "necessary."  Argenyi, 703 F.3d at 448 (citing 28 C.F.R. § 36.303(c)(1)); see also 45 C.F.R. § 84.52(d) (the RA requires an "equal opportunity to benefit from the *service in question*") (emphasis added).  Undisputedly, Roger and Linda did not seek access to the Hospital's services as a patient, a patient's spouse, or a patient's health care decision maker, a fact that distinguishes this case from nearly every case they rely upon.[8]  They played no role in Shaun's health care,

---

[7] Companions include "family member[s] . . . of an individual seeking access to, or participating in, the goods [and] services . . . of a public accommodation who, along with such individual, [are] appropriate person[s] with whom the public accommodation should communicate."  28 C.F.R. § 36.303(c)(2).

[8] E.g., Perez v. Doctors Hosp. at Renaissance, Ltd., 624 F. App'x 180 (5th Cir. 2015) (hearing-impaired parents of *infant* patient sued hospital); Argenyi, 703 F.3d at 441 (deaf student sued medical school); Liese v. Indian River Cty. Hosp. Dist., 701 F.3d 334 (11th Cir. 2012) (deaf

as evidenced by their testimony and Shaun's health care directive. Accordingly, Fairview had no duty to ensure they received certain information regarding Shaun's condition. Rather, Roger and Linda were visitors at Fairview with a close tie to an adult patient (*i.e.*, the patient's father and mother). The ADA entitled them to an equal opportunity to gain the same benefits accorded similarly-situated hearing visitors. Loye v. Cty. of Dakota, 625 F.3d 494, 499 (8th Cir. 2010).

Roger and Linda claim they did not receive that opportunity, asserting that a lack of auxiliary aids caused them to misunderstand Shaun's condition and caused Roger's absence when Shaun died. However, the record, viewed in a light most favorable to them, simply cannot sustain their assertion. Most notably, it is undisputed that Fairview secured live, on-site interpreters for Roger and Linda on May 8 and 9. Through these interpreters, Roger and Linda communicated directly with Shaun's nurse (Klopp) twice, as well as his doctor (Dr. Malik). They do *not* claim these interpreters were ineffective. To the contrary, Roger and Linda acknowledge they gleaned important information from these conversations—they both understood that the focus was on comforting Shaun, and that Shaun would no longer receive care.[9] (E.g., L. Durand Dep. 68; R. Durand Dep. 67.) Indeed, Roger testified, after meeting with an interpreter on May 8, "[they] knew

---

patient and partner sued hospital); Saunders v. Mayo Clinic, Civ. No. 13-1972, 2015 WL 774132 (D. Minn. Feb. 24, 2015) (Ericksen, J.) (deaf patient and partner sued hospital); Proctor v. Prince George's Hosp. Ctr., 32 F. Supp. 2d 820 (D. Md. 1998) (deaf patient sued hospital).

[9] Roger and Linda assert this communication was ineffective because they "didn't understand the terminology." (L. Durand Dep. 72.) However, the ADA did not require Fairview to ensure that Roger and Linda comprehended what its doctors were communicating. Argenyi, 703 F.3d at 449. Rather, it required an "equal *opportunity*" for Roger and Linda to gain the same benefit as its hearing visitors. Id. Fairview provided this opportunity by securing ASL interpreters at their request.

generally what was happening." (R. Durand Dep. 83.) Roger and Linda have not cited (and the Court has been unable to locate) a case in which similarly-situated individuals received multiple, effective auxiliary aids and nonetheless maintained a claim.

In addition, Roger and Linda—for the first time—developed a plan for Linda to reach Roger at work on May 9. Linda testified she had never contacted Roger at work before; indeed, she normally had no means to do so. (L. Durand Dep. 22.) And despite Shaun's diagnosis at age seven, his routine hospital visits, and his recent major surgery, they had never before relied on such a plan. (R. Durand Dep. 96, 103–04 (Shaun had been "in and out of the hospital"); see also P. Durand Dep. 85–86 (discussing Shaun's multiple surgeries).) Roger testified the purpose of the plan was to allow Linda to reach Roger if "Shaun had a turn for the worse." (R. Durand Dep. 95.) Indeed, when Roger arrived at work, he told his supervisors "what was going on with Shaun and that he was close. He was close." (Id. 105.) Their preparations in this regard further belie their claim that they did not understand Shaun's prognosis and, hence, that communication from Fairview was ineffective. Faced with these facts, no reasonable jury could conclude the absence of auxiliary aids was discriminatory or led to ineffective communication.

Finally, Roger and Linda identify various incidents when Shaun received care but no interpreter was provided. Despite their insistence that they did not expect interpreters around-the-clock (Doc. No. 96 at 2–3), they contend Fairview *should have* provided interpreters at these times. Either way, "not every event can be interpreted in real time." Loye v. Cty. of Dakota, 647 F. Supp. 2d 1081, 1091 (D. Minn. 2009) (Rosenbaum, J.), aff'd, 625 F.3d 494 (8th Cir. 2010). This applies with particular force to the seizures

Shaun experienced on the evening of May 8.  Id. at 1089 ("Under these middle-of-the-night emergency circumstances, any failure to provide an interpreter does not rise to the level of a violation of law.").  No provision of the ADA required Fairview staff to withhold treatment from Shaun until they secured a live interpreter for his visiting parents.  More to the point, uninterrupted auxiliary aids were not required for Fairview to communicate effectively: "[i]f [Roger and Linda] had questions about what had happened [earlier, they] had an opportunity to ask later . . . *This* is effective communication; providing interpreters at subsequent meetings and arranging for a private meeting within a reasonable time were reasonable modifications."  Id.

In sum, the record shows that Roger and Linda received an equal opportunity to access the services Fairview provided hearing visitors: before they arrived at the Hospital, they understood Shaun's lifespan was likely limited.  At the Hospital, they met with his treating physician and nurse (twice) *with the aid of effective interpreters*.  They learned that the focus was on comforting him, that he would be moved out of the ICU, and that he would no longer receive care.  They had the opportunity to ask questions.  Then, they devised a means to communicate in the event Shaun "took a turn."  Absent a genuine issue whether Fairview effectively communicated with them, their claims must fail.

## II.     Linda and a TTY

Linda also claims that Fairview discriminated against her when it denied her initial request for a TTY.  But "not every denial of a request for an auxiliary aid precludes summary judgment or creates liability under the ADA or the [RA]."  Martin v. Halifax

Healthcare Sys., Inc., 621 F. App'x 594, 602 (11th Cir. 2015). It is undisputed that Linda made no effort to arrange a TTY until the moment she required it. To be sure, when she did finally request one, Huitt initially denied her request and, in the process, undisputedly misstated Fairview's policy regarding TTYs. Yet Priscilla promptly made the call Linda was attempting to make (though she did not leave a message for Roger), and within an hour of Linda's request, Fairview provided her with a TTY. On these facts, the Court discerns no violation of the law.

### III. Priscilla

It is undisputed that Priscilla is not disabled. Nonetheless, she claims Fairview discriminated against her based on her association with Roger and Linda. The ADA provides: "[i]t shall be discriminatory to exclude or otherwise deny equal goods [or] services . . . to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C. § 12182(b)(1)(E). Neither party has cited (and the Court has been unable to locate) an Eighth Circuit decision analyzing the scope of this provision, but other courts have interpreted it narrowly, holding that non-disabled individuals may only recover for the "exclusion, denial of benefits, or discrimination that they themselves suffer[ed]." McCullum v. Orlando Reg'l Healthcare Sys., Inc., 768 F.3d 1135, 1143 (11th Cir. 2014); see also Collins v. Dartmouth-Hitchcock Med. Ctr., Civ. No. 13-352, 2015 WL 268842, at *7–8 (D.N.H. Jan. 21, 2015). In the Court's view, this approach best hews to the statutory language and heeds the Supreme Court's admonition that the law must balance "two powerful but countervailing considerations—the need to give effect to the statutory

objectives and the desire to keep [the statutes] within manageable bounds." Alexander v. Choate, 469 U.S. 287, 298–99 (1985). Accordingly, this Court agrees with the Eleventh Circuit that, in order to make out her claim, Priscilla must show that *she* was "exclude[d] or otherwise den[ied] equal goods [or] services" due to her relationship with Roger and Linda. 42 U.S.C. § 12182(b)(1)(E).[10]

Taking the record in a light most favorable to Priscilla, she experienced "stress and anxiety [while] having to serve as healthcare agent and also facilitate communications for her parents[,] multiplied by the fact that she [did] not know sign language fluently and was dealing with her grief and other emotions while watching her brother die." (Doc. No. 89 at 39.) But, as discussed above, Fairview fulfilled its obligations to Roger and Linda. More critically, there is no evidence in the record of any benefit, good, or service that Fairview denied *Priscilla* based on her association with Roger and Linda. Absent such evidence, her claim fails. McCullum, 768 F.3d at 1143.

Priscilla contends that Fairview violated the law by "forcing" her to communicate with Roger and Linda when no qualified interpreter was present. (Id. 168.) But there is simply no evidence in the record suggesting that Fairview compelled Priscilla to interpret for Roger and Linda or even requested that she do so. (See P. Durand Dep. 168 (Q: "[D]id anyone at Fairview say . . . 'We want you to interpret'? Was that ever expressly

---

[10] The Court recognizes that other courts have adopted a broader approach. E.g., Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 277 (2d Cir. 2009); Spector v. Norwegian Cruise Line Ltd., No. CIV.A. H-00-2649, 2002 WL 34100212, at *15 (S.D. Tex. Sept. 9, 2002), aff'd in part, rev'd in part and remanded, 356 F.3d 641 (5th Cir. 2004), rev'd, 545 U.S. 119 (2005). However, for the reasons stated, the Court determines a narrow construction is appropriate.

communicated to you?" A: "That was never explicitly said, no.").)  Indeed, the record reveals that Priscilla told Fairview staff on May 8 that she could not interpret for her parents (id. 149), and Fairview's policy in fact prohibited reliance on children of deaf adults to interpret (Doc. No. 90-22 at 5).  Accordingly, this case is a far cry from Loeffler, upon which Priscilla heavily relies, where the minor children of a deaf hospital patient were removed from school, equipped with hospital-provided pagers, and "compelled" to interpret for their parents.  582 F.3d at 279 (Wesley, J., concurring).  In the Court's view, the ADA and RA do not authorize associational-discrimination claims for anyone present with a deaf individual who gratuitously signs to that individual.  For these reasons, Fairview is entitled to judgment as a matter of law.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED**: (1) Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 49) is **DENIED**; (2) the Amended Complaint (Doc. No. 5) is **DISMISSED WITH PREJUDICE**; (3) Fairview's Amended Motion for Summary Judgment (Doc. No. 31) is **GRANTED**; and (4) all other pending Motions are **DENIED AS MOOT**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date:  January 18, 2017                                s/Richard H. Kyle
                                                                                RICHARD H. KYLE
                                                                                United States District Judge